**HERITAGE MUTUAL INSURANCE COMPANY, Plaintiff, Counter–Defendant,**

v.

**ADVANCED POLYMER TECHNOLOGY, INC., Leo J. Leblanc, and Environ Products, Inc., Defendants, Counter–Plaintiffs.**

No. IP96–0542–C–B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 16, 2000.

Jeffrey A. Doty, Kightlinger & Gray, Indianapolis, IN.

Thomas W. Conklin, Conklin Murphy & Conklin, Chicago, IL.

John David Hoover, Johnson Smith Pence Densborn Wright & Heath, Indianapolis, IN.

Dwight D. Lueck, Barnes & Thornburg, Indianapolis, IN.

Jeremy T. Ross, Schiffman & Ross, Philadelphia, PA.

### ENTRY DECLARING THAT PLAINTIFF HAS NO DUTY TO DEFEND DEFENDANTS

BARKER, Chief Judge.

This case represents another installment in the ongoing debate about the meaning of "advertising injury," a popular phrase used to describe a type of insurance coverage provided in standard versions of commercial general liability insurance policies issued since the 1970's. Plaintiff, Heritage Mutual Insurance Company ("Heritage"), filed a complaint seeking a declaratory judgment that it has no duty to defend or to indemnify its insureds, Defendants Advanced Polymer Technology, Inc. ("APT"), and Leo J. LeBlanc ("LeBlanc"), in an underlying action brought against APT and LeBlanc by Environ Products, Inc. ("Environ"), in the United States District Court for the Eastern District of Pennsylvania. APT has counterclaimed, seeking a declaration that Environ's complaint in the underlying action contains allegations of

advertising injury, thereby triggering Heritage's duty to defend and to indemnify it in the underlying action.

On March 25, 1998, we denied APT's motion for partial summary judgment, in which APT maintained that Heritage had a duty to defend it in the Environ action because, in APT's view, Environ had alleged an advertising injury within the meaning of the Heritage–APT policy. We denied APT's motion because even if we assumed that initial coverage was proper under the policy, issues of material fact remained as to the "first publication" exclusion in the policy, which excludes coverage for advertising injury arising out of material whose first publication took place before the beginning of the policy period. In November 1998, Heritage moved for summary judgment, which we denied with respect to APT on February 1, 1999.[1] At issue in that motion was the rather narrow matter of whether the first publication exclusion prevented coverage for any alleged advertising injury, although we noted that the initial coverage issue, namely whether Environ had alleged an advertising injury within the meaning of the Heritage–APT policy, had not been briefed by the parties in those submissions and had yet to be determined.

On May 17, 1999, this action proceeded to a one-day bench trial. The parties eventually submitted their post-trial briefs, which included arguments on both the initial coverage issue and the first publication exclusion. After thoroughly considering the issues advanced in those submissions, we conclude that Heritage has no duty to defend APT in the underlying action filed by Environ since its complaint definitively fails to contain allegations that APT committed an advertising injury offense enumerated in the Heritage–APT policy.

## Background

APT produces underground, secondarily-contained flexible piping systems that include a flexible inner supply pipe and an outer secondary containment pipe. The piping systems are mainly utilized by entities in the petroleum industry, such as gasoline filling stations, to transport fuel safely from storage tanks to fuel dispensers. APT was insured by Heritage from April 4, 1993 through April 4, 1994, and Heritage renewed the policy through April 4, 1995. See Pl.Ex. 10. The policy at issue here, known as the Commercial General Liability ("CGL") form, represents a 1986 version written by the Insurance Services Organization ("ISO"), a for-profit private trade organization that generates standard insurance forms for use by its clients, mainly insurance companies.[2] See Trial Tr. at 108–09. While some insurers may alter the forms they receive from ISO and tailor the standard language based upon the unique coverages requested by their insureds, insurers often adopt the ISO forms verbatim. In this case, APT falls within the latter camp, having lifted the language in the insurance policy at issue here directly from the 1986 version of ISO's CGL form.

Coverage "B" of the CGL policy, entitled "Personal and Advertising Injury Lia-

---

1. We granted Heritage's motion in respect to defendant Leo J. LeBlanc, finding that the insurance policy did not include coverage for LeBlanc as an individual insured separate from APT itself. Defendant Environ technically remains a party to this action, although it stands on the periphery of this insurance coverage dispute and has not actively participated in this litigation. See Def. APT's Trial Brief at 4 n.2 ("Environ's position is as a nominal defendant. Environ is not expected to participate at trial. It has agreed to be bound by the determination of this matter.").

2. ISO periodically revises and clarifies the coverage offered by its standard insurance forms and alters, deletes or adds language accordingly. For instance, the 1986 version of the CGL form replaced the 1976 version, and the 1986 version has been modified as well, such as by the 1998 ISO CGL policy form. See Trial Tr. at 109, 116–17. Each unique version of the CGL has spawned considerable litigation over the scope of its coverage and exclusion provisions, with the 1986 version being no exception.

bility," provided in its "Insuring" clause that Heritage would insure APT and LeBlanc for any "*advertising injury* caused by an offense committed in the course of advertising [APT's] goods, products or services," provided that the offense was committed during the policy period. Pl.Ex. 10 at 3/9. The policy separately defined "advertising injury" as injury arising out of one or more of the following offenses:

(a) oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

(b) oral or written publication of material that violates a person's right of privacy;

(c) misappropriation of advertising ideas or style of doing business; or

(d) infringement of copyright, title or slogan.

*Id.* at 7/9. The policy does not define "misappropriation of advertising ideas or style or doing business" or "infringement of copyright, title or slogan."

One of the policy's coverage exclusions, the "first publication" exclusion, provides that insurance coverage does not apply to "*advertising injury* ... [a]rising out of oral or written publication of material whose first publication took place before the beginning of the policy period." *Id.* at ⅜ ("exclusions" to advertising and personal injury).

Each annual policy that APT purchased provided that Heritage would pay any sums that APT became legally obligated to pay as damages because of any advertising injury to which the coverage applied, limited to $1,000,000 per person or organization. Additionally, the policy established Heritage's "duty to defend any *suit* seeking those damages." *Id.* (emphasis in original).

On November 17, 1995, Environ filed a seven-count complaint in the Eastern District of Pennsylvania against APT and LeBlanc (the underlying action), essentially alleging that APT stole its underground piping product and infringed certain claims of its patent. *See* Def. Ex. 21 (Environ Compl.). Specifically, Environ alleged patent infringement (count I), induced and contributory patent infringement (count II), federal unfair competition in violation of the Lanham Trademark Act (count III), state unfair competition based on the same allegations as the previous count of federal unfair competition (count IV), conversion (count V), unjust enrichment (count VI), and breach of fiduciary duty (count VII). APT tendered the defense to Heritage, who denied coverage after a series of communications with APT and declined to defend APT against Environ's allegations. At last update by the parties, the underlying litigation between Environ and APT was ongoing. One issue in that action, the question of inventorship, has been appealed to the Federal Circuit, although we have not been informed on the status of that particular matter. The parties agree that regardless of the resolution of the inventorship issue, the remaining aspects of that litigation remain pending in the Eastern District of Pennsylvania. In other words, APT's actual liability in the underlying action has not been established, a fact that explains why the parties essentially have treated this action as a duty to defend case, as do we.

On April 19, 1996, Heritage filed a request for declaratory judgment in this court, seeking a declaration that it has no duty to defend or to indemnify APT or LeBlanc in the Environ action, and APT counterclaimed. After denying the parties' separate summary judgment motions on fairly narrow grounds, the parties adduced additional factual evidence during a one-day bench trial, which evidence pertained mainly to the first publication exclusion, although the parties were free to submit evidence on initial coverage issues as well. The parties eventually submitted their post-trial briefs on all the legal issues that they considered pertinent to the resolution of this case. We now proceed to

address the contentions developed by the parties in those submissions.

## Discussion

### Applicable Indiana Insurance Law

As a federal court sitting in diversity, we must evaluate Indiana law as it pertains to this dispute. *See Colip v. Clare*, 26 F.3d 712, 714 (7th Cir.1994). Heritage and APT agree that our analysis is governed by Indiana's substantive law. *See* Pl. Post–Trial Br. at 9; Def. Trial Br. at 15; Def. Supp. Trial Brief (hereinafter "Def. Post–Trial Br.") at 1. Under Indiana law, a contract for insurance is subject to the same rules of interpretation as are other contracts. *See USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 537–38 (Ind.1997). The interpretation is "primarily a question of law for the court, even if the policy contains an ambiguity needing resolution." *Id. (quoting Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind.1992)). The insured is required to prove that her claims fall within the coverage provision of her policy, but the insurer bears the burden of proving specific exclusions or limitations to policy coverage. *See Erie Ins. Group. v. Sear Corp.*, 102 F.3d 889, 892 (7th Cir.1996) (applying Indiana law). The insurer's duty to defend, which is broader than its duty to indemnify, is determined by the nature of the claim in the underlying complaint, not its merits. *See Ticor Title Ins. Co. v. FFCA/IIP 1988 Prop. Co.*, 898 F.Supp. 633, 638 (N.D.Ind.1995) (applying Indiana law). An insurer must defend an action even if only a small portion of the conduct alleged in the complaint falls within the scope of the insurance policy. *See Curtis–Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119, 1122 (7th Cir.1994).

The primary purpose in the construction of contracts is to ascertain and give effect to the mutual intention of the parties. *See Hutchinson, Shockey, Erley & Co. v. Evansville–Vanderburgh County Bldg. Auth.*, 644 N.E.2d 1228, 1231 (Ind. 1994). The intentions of the parties to a contract are to be determined by the "four corners" of the document. *See Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 355 (Ind.Ct.App.1995). If the insurance policy is clear and unambiguous, then it should be given its plain and ordinary meaning without resorting to extrinsic evidence. *See Nuckolls*, 682 N.E.2d at 537–38; *Stout v. Kokomo Manor Apartments*, 677 N.E.2d 1060, 1064 (Ind.Ct.App.1997). An unambiguous policy must be enforced according to its terms, even those which limit the insurer's liability. *See Sans v. Monticello Ins. Co.*, 676 N.E.2d 1099, 1101–02 (Ind.Ct.App.1997). When an insurance contract contains an ambiguity, it should be strictly construed against the insurance company. *Id.* An ambiguity does not arise merely because the two parties proffer differing interpretations of the policy language. *Id. (citing Lexington Ins. Co. v. American Healthcare Providers*, 621 N.E.2d 332, 336 (Ind.Ct.App. 1993)). Rather, the policy is ambiguous only if "reasonably intelligent persons would differ as to its meaning." *Id.; see National Ben Franklin Ins. Co. of Illinois v. Calumet Testing Servs., Inc.*, No. 98–3934, 1999 WL 594926, at *4 (7th Cir. Aug. 6, 1999) (applying Indiana law). When an insurance company has failed to clearly exclude that which the insured attempted to protect against, a court must construe the ambiguous contract to further the policy's basic purpose of indemnity. *Id.* Yet, when the underlying factual basis of the complaint, even if proved true, would not result in liability under the insurance policy, the insurance company can properly refuse to defend. *See Wayne Township Bd. of Sch. Comm'rs v. Indiana Ins. Co.*, 650 N.E.2d 1205, 1208 (Ind.Ct.App.1995).

### APT Has Failed To Demonstrate That Environ's Allegations In The Underlying Action Qualify As An Advertising Injury Offense Within The Meaning Of The Coverage Provisions Of The Heritage–APT Policy

#### A. Environ's Allegations In The Underlying Action

An insurer's duty to defend necessarily depends upon the allegations, including the

facts alleged, in the underlying complaint, so we begin our analysis with a close examination of Environ's complaint. *See, e.g., Federal Ins. Co. v. Stroh Brewing Co.,* 127 F.3d 563, 566 (7th Cir.1997) (applying Indiana law). In Count I, "patent infringement," Environ alleges that APT willfully infringed claims 29 and 31 of its '896 patent, which issued on March 29, 1994, and claims 1,3,4, 6 and 24 of its '130 patent, which issued on June 18, 1996. Environ specifically alleges that "APT is *selling* underground containment chambers and underground flexible coaxial pipe for use in secondary containment systems" that infringe certain claims of its patents. *See* Def. Ex. 21 (Environ Compl. ¶ 18) (emphasis added). As evidence that APT had actually sold the allegedly infringing chambers and piping, Environ attached two APT advertising brochures, with one brochure dated 1995 and the other brochure dated August 1, 1993. Environ does not complain about the contents of or depictions in the actual advertisements.

In Count II, "induced and contributory patent infringement," Environ incorporates all previous allegations and adds that APT has induced patent infringement, in addition to contributing to infringement by making and selling the piping products. *Id.* ¶¶ 21–30.

█ In Count III, "federal unfair competition" under the Lanham Act, Environ contends that Leo LeBlanc unfairly competed with it by wrongfully appropriating confidential information, including the flexible, coaxial pipe for secondary containment of hazardous fluids. *Id.* ¶¶ 33–34. Environ then complains that both APT and LeBlanc unfairly competed with it by misappropriating its alleged invention and by filing an application for a patent on the piping product.[3] *Id.* ¶¶ 34–35. Environ also claims that APT made "false and misleading statements as to the creation or ownership" of the piping product "in its *application* for a patent." *Id.* (emphasis added). These alleged false or misleading statements in APT's patent application, according to Environ, constituted false descriptions and designations of origin and risked influencing investment or purchasing decisions. *Id.* As we noted in our second summary judgment entry, the parties have not contended that the patent application constituted an advertisement or an item "in the course of advertising" as required by the Heritage–APT policy.[4]

Environ's complaint alludes to the substantive content of APT's advertisements for the first time in paragraph 40 of Count III, in which Environ alleges that "Defendant APT's marketing of its POLY–TECH piping system as 'patent pending' creates a cloud over the ownership of the Invention, thereby discouraging investment in or purchase of the Invention from Environ. Environ has suffered injury or a likelihood of injury in terms of the loss of clearly under-

---

**3.** As background, Michael Webb (affiliated with Environ) and Leo LeBlanc (affiliated with a company known as EBW) joined forces in 1991 to form APT. Webb and LeBlanc worked together in developing piping products in the early 1990s before agreeing to part professional company, with APT remaining in control of EBW. Webb eventually filed a patent application for a piping product on March 25, 1992, which ultimately issued on March 29, 1994 (the '896 patent at issue in the underlying action). LeBlanc and his partner, Andrew Youngs, also filed their patent application on a piping product in March 1992, within days of Webb's application. *See* Trial Tr. at 27–28, 32. The LeBlanc/Youngs application and its continuations in part apparently are still pending before the Patent and Trademark Office, and we express no opinion on the similarity or dissimilarity between the piping systems described in the Webb and LeBlanc/Young patent applications.

**4.** Even if APT had argued that its patent application was an action taken in the course of advertising its products as required by the policy, that argument would fail. Our circuit has interpreted the phrase "in the course of advertising" to refer unambiguously to "active solicitation of business" and "actual, affirmative self-promotion" of goods or services, categories into which a patent application filed with the PTO cannot reasonably be collapsed. *See Erie Ins. Group,* 102 F.3d at 894.

stood title to the Invention." *Id.* ¶ 40. Although Environ refers to "marketing," not advertising, a conceptual distinction that has proved dispositive in other cases (*see Westowne Shoes, Inc. v. City Ins. Co.,* No. 95–2328, 1996 WL 175084, at *3–4 (7th Cir. Apr. 11, 1996)), our liberal reading of the complaint in APT's favor yields the reasonable conclusion that Environ is at least implicitly referring to the two APT advertisements that it referenced in Count I of the complaint. Those two advertisements contain the phrase "patent pending," albeit in such an unobtrusive manner as to cast considerable doubt on use of the phrase as a promotional tool. Nonetheless, we take note that Environ's principle allegation involving advertising pertains to APT's use of the phrase "patent pending" in its marketing materials.

The remaining counts are all brought under state law. Count IV of Environ's complaint, unfair competition, is predicated on the identical facts as Count III, which it incorporates by reference. In Count V, conversion, Environ contends that Leo LeBlanc converted Environ's confidential information by wrongfully using the information "in a patent application to attempt to obtain a patent on the Invention, all to LeBlanc's and APT's gain." *Id.* ¶ 53. In Count VI, unjust enrichment, Environ claims that APT has unfairly used confidential information for profit and enrichment "at the expense of Environ, the rightful owner of the Invention." *Id.* ¶ 59. In Count VII, breach of fiduciary duty, Environ contends that LeBlanc breached a fiduciary duty to Environ by misappropriating proprietary information that he obtained while a member of Environ's Board of Directors in the early 1990's, prior to the dissolution of Webb's and LeBlanc's professional relationship. Finally, in one of its fifteen prayers for relief, Environ requests that APT be ordered "to recall for destruction, and deliver up to Environ for destruction, all promotional materials, advertisements, and other communications bearing thereon any representations that are or may be false or misleading concern-

ing the ownership of the Invention." *Id.* ¶ (E).

## B. APT Fails To Demonstrate That Environ's Allegations Trigger Heritage's Duty To Defend Under Any "Advertising Injury" Offense Enumerated In The Policy

The Heritage–APT policy applies to "*advertising injury* caused by an offense committed in the course of advertising [APT's] goods, products or services." Pl.Ex. 10 at ⅝ (italics in original). Therefore, APT's putative duty to defend depends upon (1) the existence of allegations that fall within one of the four categories of offenses in the policy that define "advertising injury," and (2) the demonstration that the given advertising injury offense occurred in the course of advertising APT's goods, products or services. APT, the insured, bears the burden of demonstrating that the allegations in Environ's complaint could fall within the coverage provisions of the Heritage–APT policy, although Heritage, the insurer, has the burden to prove the applicability of any exclusions, such as the first publication exclusion. *See Erie Ins. Group v. Sear Corp., supra,* 102 F.3d 889, 892, 893 (7th Cir.1996) (applying Indiana law).

Before we consider the specific coverage provisions in the Heritage–APT policy, we pause to highlight the specific nature of the offenses that define advertising injury, even though the advertising injury coverage appears in a comprehensive general liability insurance form. The insurance policy provides coverage for the following advertising injury offenses, and only these offenses: (a) oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; (b) oral or written publication of material that violates a person's right of privacy; (c) misappropriation of advertising ideas or style of doing business; or (d) infringement of copyright, title or slogan. While

Heritage and APT both agreed that these types of advertising-related risks would be insured, APT did not purchase coverage for all allegations of injury somehow relating to advertising. Thus, Environ's mere use of such words as "marketing" and "advertisements" in its complaint, and its attachment of advertisements under Count I, reveals little in and of itself. *See United Nat'l Ins. Co. v. SST Fitness Corp.*, 182 F.3d 447, 450 (6th Cir.1999) (finding that insurance policy used "advertising" in a specific, not general, sense; therefore, use of "advertises" in the underlying complaint alone did not trigger the insurer's duty to defend). The touchstone for determining whether Environ has alleged an advertising injury is the enumerated offenses in the policy, for Heritage insured only those risks, no more, no less.

We also note that although substantive Indiana law governs this dispute, neither the Supreme Court of Indiana nor its court of appeals has addressed the meaning and scope of the advertising injury coverage and exclusion provisions at issue in this case. Yet, armed both with the contract principles that Indiana courts have adopted to analyze insurance policies and with the robust corpus of state and federal decisions from other jurisdictions inter-

preting similar provisions, we are sufficiently (although surely not ideally) informed to predict how Indiana's highest court would resolve this case.

### 1. Infringement of copyright, title or slogan

■ APT contends that the allegations in Environ's complaint potentially fall within the offense of "infringement of ... title." APT broadly defines "title" to include ownership, specifically "an established or recognized right to something," which would include ownership of intellectual property such as patents. Def. Post–Trial Br. at 20 (*quoting* Random House Unabridged Dictionary (2d ed.1993)). Therefore, APT concludes that the "patent claims" in the Environ complaint, including "at least the induced infringement claims against APT," qualify as infringement of "title." [5] APT also asserts that the federal unfair competition claim in Count III triggers Heritage's duty to defend because Environ uses the word "title" in that Count. APT reasons that because Environ claimed that APT's marketing of the piping product as "patent pending" created a "cloud over the ownership" of the piping product, thereby causing the "loss of clear-

---

5. We will assume without deciding that direct and induced patent infringement offenses could occur in the course of advertising, although courts routinely have concluded that injury from direct patent infringement does not have a causal connection to advertising injury. *See, e.g., SST Fitness Corp.*, 182 F.3d at 451 (6th Cir.) (patent infringement occurs by making, using or selling a patented invention, not by advertising it; "the advertising activities must cause the injury—not merely expose it") (internal quotations omitted) (*quoting Simply Fresh Fruit, Inc. v. Continental Ins. Co.*, 94 F.3d 1219, 1222–23 (9th Cir. 1996)). Yet, it does strike us as plausible that induced patent infringement may occur in the course of advertising, although an induced infringement claim is still predicated on underlying direct infringement by the induced actor. We also note that effective January 1, 1996, after the relevant dates of the policies at issue here and thus immaterial to this case, Congress modified the definition of patent infringement to include "offers to sell," a

change that at least one court has found relevant to deciding whether patent infringement is the type of offense that could occur in the course of advertising. *See Everett Assocs., Inc. v. Transcontinental Ins. Co.*, 57 F.Supp.2d 874, 881 (N.D.Cal.1999); 35 U.S.C. § 271(a) ("Whoever without authority makes, uses, [offers to sell], or sells any patented invention, ... during the term of the patent therefor, infringes the patent") (bracketed language effective January 1, 1996). Of course, even if direct and induced patent infringement are the types of offenses that could occur in the course of advertising, the essential inquiry remains whether those claims fall within one of the specific, predicate advertising injury offenses in the Heritage–APT policy. *See Tradesoft Tech., Inc. v. Franklin Mutual Ins. Co.*, 329 N.J.Super. 137, 746 A.2d 1078, 1085–86 (App.Div.2000) (disagreeing with *Everett* and finding that patent infringement claims after the 1996 amendments did not fall within predicate advertising injury offenses).

ly understood title to the Invention," Environ's definition of title corresponds to the meaning of "title" in the policy. APT also contends without explanation that the state unfair competition claim in Count IV falls within the advertising injury offense of infringement of title.[6] *See* Def. Trial Br. at 3, 17; Def. Post–Trial Br. at 19–20; Def. Resp. Pl. Post–Trial Br. at 6.

Heritage rejoins that the word "title," as used in the context of this specific policy, refers not to ownership generally, but rather to a name or designation given to a work of art or other publishable material. Heritage concludes that because Environ and APT designate their respective products by completely different names, and since Environ has not alleged that APT misappropriated the name of Environ's

piping product, it has no duty to defend under the "infringement of ... title" offense. *See* Pl. Post–Trial Br. at 14–15. We agree with Heritage, and find that the term, "title," as examined in the context of this particular insurance policy, unambiguously refers to the concept of name, such as a name of a literary or artistic work, rather than to general ownership of an invention or other thing.

We are not unaware that dictionaries attribute multiple meanings to the word "title." Title has been defined as "an identifying name given to a book, play, motion picture, musical composition, or work of art." American Heritage Dictionary (2d College ed.1991); *see Palmer v. Truck Ins. Exchange,* 21 Cal.4th 1109, 1116 n. 5, 90

---

6. In construing the arguments advanced by APT, we have considered the three submissions it filed in conjunction with trial: APT's 27–page trial brief, its 27–page "Supplemental Trial Brief," which essentially is its post-trial brief (and we have referred to it as such in this entry), and its 13–page "Response to Heritage's 'Post–Trial Brief.'" On the second page of its post-trial brief, APT recognized that the issues at trial covered the questions of basic coverage, exclusions and damages. In addition to the 67–pages of briefing it dedicated to these issues, APT attempts to "incorporate by reference" into its briefs the 59–page, single-spaced report (121 footnotes) of its expert witness, David Gauntlett, despite our repeated admonitions during and before trial that Gauntlett's legal opinions and analysis were unnecessary and irrelevant to our ultimate decision. Thus, for a multitude of reasons, we decline to consider APT's tendered expert report in any respect, except for pages 16–17, which relate to an immaterial factual comparison of advertisements (discussed in the text, *infra* ). *See* Def. Post–Trial Br. at 13.

First, we stated before trial when ruling on motions in limine that Gauntlett would be permitted to testify as a fact witness only, without offering legal opinions or authority. We expressly noted that if APT elected to utilize the legal arguments in the expert report, it could utilize Gauntlett's "legal views," "spin on authorities," and "legal conclusions" by writing its own post-trial brief (or hiring him to do it). Trial Tr. 5–6; 148–49. We also noted during trial that the legal analysis ran "warp and woof" through the expert report, such that redacting the report would

make it non-sensical. *Id.* at 168. We allowed APT to attempt to offer specific portions of the report during post-trial briefing, at which point we would make further rulings. As demonstrated in APT's post-trial brief, APT clearly understood our ruling that its expert's legal opinions and analysis would not be admitted in evidence. *See* Def. Post–Trial Br. at 2 n.1. Yet, APT attempts to circumvent this ruling by requesting that we consider the expert report, in its entirety, not as "evidence," but as "legal argument," which is the precise reason why we refused to consider it as "evidence." Second, we refuse to consider the expert report because it fails to comply with form and length requirements of our local rules. *See* S.D. Ind. L.R. 5.1 (double spacing requirement); L.R. 7.1 (length restrictions). Third, the content of the report, which clearly is an oft-used piece of work that has been employed in litigation in other jurisdictions and (slightly) tailored to the facts of this case under Indiana law, diverges markedly at times from the arguments raised by APT in its own briefings. Fourth, even if we considered the contentions and authority cited in the report, a considerable amount of which we have located and analyzed independently, our conclusion in this case would not change. Ultimately, APT's counsel has had ample opportunity in its three trial submissions to advocate on APT's behalf, to advance arguments and to cite authority that it deems most relevant to our decision-making. And while APT's submissions are not a model of organization, we have afforded it the benefit of the doubt when determining whether it has advanced certain arguments, however superficial or undeveloped they may be.

Cal.Rptr.2d 647, 988 P.2d 568 (Cal.1999) (collecting dictionary definitions of title, concluding that in the context of the unique policy language at issue in that case, title "can only mean the name of a literary or artistic work."). A strictly legal interpretation of the word, title, can be found in Black's Law Dictionary (7th ed.1999): "[t]he union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property." Hence, we view it as a fruitless exercise to attempt to ascertain the clear meaning of a word without resorting to the context and contours of the entire insurance policy in which it appears. *See NationsCredit Commercial Corp. v. Grauel Enters., Inc.*, 703 N.E.2d 1072, 1076 (Ind.Ct.App.1998) ("When determining whether a contract is ambiguous, a court must view the contract as a whole and not in discrete units."); *Keystone Square Shopping Ctr. Co. v. Marsh Supermarkets, Inc.*, 459 N.E.2d 420, 422 (Ind.Ct. App.1984) ("In general a contract is considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context.").

Initially, we find that "infringement of ... title" cannot reasonably be construed to include Environ's claims for direct and induced patent infringement. First, and perhaps most strikingly, had the parties intended for advertising injury to apply to patent infringement, they easily could have included such language in the four sub-part paragraphs of the definition of "advertising injury." We find it implausible that the parties would have intended that direct and induced patent infringement would be covered under the policy without expressly listing those offenses in the phrase "infringement of copyright, title or slogan." Direct and induced patent infringement claims can hardly be considered a nominal or obscure aspect of infringement law. On the contrary, in the context of expressly listing three types of infringement coverage, the parties' failure to even mention patent infringement, ostensibly one of the most important coverages for companies in the business of inventing and selling products, speaks volumes about their intent not to provide coverage for such an offense. *See, e.g., U.S. Test, Inc. v. NDE Envtl. Corp.*, 196 F.3d 1376, 1381 (Fed. Cir.1999) (finding it "unequivocally clear from the plain language" of the definition of advertising injury that patent infringement was not covered under the policy; noting that the word "patent" was noticeably absent from a list of other "forms of intellectual property infringement, namely copyright").

Moreover, the presence of the word "title" in the context of "copyright" and "slogan" supports the conclusion that title refers unambiguously to the name of a book, film, or other literary or artistic work. *See Curtis–Universal*, 43 F.3d at 1124 ("A word sometimes picks up meanings from its neighbors."). First, several courts have recognized that title, when defined as a name of a work, logically compliments the definition of copyright in the phrase "infringement of copyright, title or slogan." *See, e.g., Palmer*, 21 Cal.4th at 1117 n. 8, 90 Cal.Rptr.2d 647, 988 P.2d 568 ("Adopting this definition of 'title' [as the name of a literary or artistic work] also gives effect to each term in the coverage clause ... because the name of a literary or artistic work is not protectible by copyright."); *see also* 37 C.F.R. § 202.1(a) (1999) (listing examples of material not subject to copyright, including "[w]ords and short phrases such as names, titles, and slogans; ..."). Because a title of a work is similar to the type of information protected by copyright law, but for its brevity, it strikes us as a plain and natural reading of "infringement of copyright, title or slogan" to define title as a non-copyrightable title of a book, film, or other literary or artistic work. *See ShoLodge, Inc. v. Travelers Indem. Co. of Illinois*, 168 F.3d 256, 259 (6th Cir.1999) (finding the term "title" not ambiguous under similar policy language and defining title in identical fashion).

Second, if we define title specifically as a short name of a work, as opposed to general ownership, or as APT defines it, "an established or recognized right to something," then the words copyright, title and slogan all share the same inherent quality: they directly involve a form of expression, yet they retain distinct meanings. *Cf. Curtis–Universal*, 43 F.3d at 1123–24 (expressing reluctance to expand "unfair competition" in a prior version of the CGL advertising injury policy to include business torts that fall beyond the type of torts, such as copyright infringement, that are mainly concerned with "harmful speech in various forms"; defining title, in dicta, as titles "presumably of books, songs, products, services, and so forth"). A copyright is a property right in an original work of authorship, such as a literary, musical, artistic, photographic, or film work, fixed in any tangible medium of expression, giving the holder the exclusive right to reproduce, adapt, distribute, perform, and display the work. *See, e.g.,* 17 U.S.C. §§ 102, 106. A slogan is a brief, striking phrase used in advertising or promotion. *See, e.g.,* Webster's Third New International Dictionary (unabridged 1993). And title, defined as a name of a work, and not so broadly as a "right to something," melds naturally with copyright and slogan in implicating a form of expression, which yields some explanation for the presence of these terms in an advertising injury insurance policy.

Approached from a different conceptual framework, defining title as broadly as "an established or recognized right to something" would overwhelm the definitions of copyright and slogan, rendering them superfluous. Copyrights and slogans represent property rights that may also be infringed, or in APT's vernacular, they are "something" in which one may establish or recognize a right. *See Precision Automation, Inc. v. West American Ins. Co.,* No. 99–35184, 1999 WL 1073819, at *3 (9th Cir. Nov. 24, 1999) (finding that a broad reading of title as a property right would render the terms copyright and slogan super-

fluous since "[c]opyrights and trademarked slogans are property rights that can be infringed"); *Zurich Ins. Co. v. Sunclipse, Inc.,* 85 F.Supp.2d 842, 855 (N.D.Ill.2000) ("If indeed 'title' referred to ownership in property, then the words 'copyright' and 'slogan' would be rendered superfluous."). APT's definition of title would swallow two other perfectly valid and operative terms in the Heritage–APT policy, a result at odds with Indiana's rules of contract construction. *See Samar, Inc. v. Hofferth,* 726 N.E.2d 1286, 1290 (Ind.Ct.App.2000) ("[A] contract [must] be read as a whole, and the language construed so as not to render any words, phrases, or terms ineffective or meaningless."). As we have said, the parties easily could have included patent infringement in the category of infringement offenses if they intended advertising coverage to be so broad, but clearly they did not.

We are not alone in concluding that "infringement of ... title" refers to a name of a work (not ownership of "something," such as a patent), thereby excluding coverage under an advertising injury insurance policy for claims of direct or induced patent infringement. A host of federal and state courts have so held, typically employing some aspect of the analysis we have explicated above. *See, e.g., U.S. Test,* 196 F.3d at 1381 ("We concur with the reasoning of several other courts that have construed the term 'title,' when grouped with the terms 'slogan' and 'copyright,' to mean 'name,' e.g., the name of a literary or artistic work, as opposed to the ownership of an invention."); *Owens–Brockway Glass Container, Inc. v. International Ins. Co.,* 884 F.Supp. 363, 368 (E.D.Cal.1995) (same), *aff'd,* 94 F.3d 652, 1996 WL 445082 (9th Cir.1996) (affirming district court's "well reasoned opinion"); *ShoLodge,* 168 F.3d at 259 (6th Cir.) ("[T]he term 'title' is not ambiguous and [ ] it does not include service marks ... [i]n ordinary use, the word 'title' generally refers to the non-copyrightable title of a book, film, or other literary or artistic

work."); *Callas Enters., Inc. v. Travelers Indemnity Co. of America*, 193 F.3d 952, 957 (8th Cir.1999) (same; agreeing with Sixth Circuit's interpretation of "title" as "natural, reasonable, and unforced"); *Precision Automation*, 1999 WL 1073819, at *2–3 (9th Cir.) (similar); *Atlantic Mut. Ins. Co. v. Brotech Corp.*, 857 F.Supp. 423, 429 (E.D.Pa.1994) ("[T]he term 'title' refers to a distinctive name or designation used to identify a literary or artistic work."), *aff'd*, 60 F.3d 813 (3rd Cir.1995); *Zurich*, 85 F.Supp.2d at 855 (N.D.Ill.) (rejecting definition of title as ownership of property); *Gencor Indus., Inc. v. Wausau Underwriters Ins. Co.*, 857 F.Supp. 1560, 1564 (M.D.Fla.1994) ("It is even more absurd to suggest that the phrase 'infringement of ... title,' ... encompasses patent infringement or inducement to infringe. Basic common sense dictates that if these policies covered any form of patent infringement, the word 'patent' would appear in the quoted 'infringement' clauses."); *Mez Indus., Inc. v. Pacific Nat'l Ins. Co.*, 76 Cal.App.4th 856, 874–75, 90 Cal.Rptr.2d 721 (Cal.Ct.App.1999); *Maxconn Inc. v. Truck Ins. Exchange*, 74 Cal. App.4th 1267, 1275–76, 88 Cal.Rptr.2d 750 (Cal.App.1999).

In conjunction with these cases and for the reasons discussed previously, we conclude that the term "title" in the Heritage–APT policy unambiguously refers to a name of a work, such as a non-copyrightable title of a book, film, or other literary or artistic work, and accordingly find that it does not encompass claims for direct or induced patent infringement.

Further, we perceive no merit in APT's contention that Environ's use of the word "title" in Count III of the underlying complaint triggers Heritage's duty to defend. Environ clearly referred to ownership rights with its reference to title (e.g. "creating a cloud over the ownership of the Invention"), a definition that, as we have explained, is inconsistent with the plain meaning of title as that term is used in the specific context of the Heritage–APT poli-

cy. Moreover, Heritage points out that Environ and APT do not designate their respective piping products by the same or similar names. In any event, Environ never alleges in either its federal or state unfair competition counts, or anywhere in the complaint for that matter, that APT infringed the name, or "title," of its piping product. Therefore, we find that the allegations and facts alleged in Environ's complaint fail to engage Heritage's duty to defend under the "infringement of ... title" offense in the policy.

### 2. Misappropriation of advertising ideas or style of doing business

■ APT contends that the two advertisements attached to Environ's complaint under Count I (patent infringement) demonstrate that APT is alleged to have misappropriated Environ's "advertising ideas." APT also resorts to extrinsic evidence to argue that the previous version of the CGL policy (the 1976 version) included coverage for piracy and unfair competition, two offenses that, although now deleted from the Heritage–APT policy, nestle themselves within the "style of doing business" offense. *See* Def. Post–Trial Br. at 12–13, 20–21; Def. Resp. to Pl. Post–Trial Br. at 5. Thus, APT claims that Environ's patent infringement and unfair competition counts are covered under the "misappropriation of advertising ideas or style of doing business" offenses.

Heritage responds that Environ never alleged that APT misappropriated Environ's advertising ideas or comprehensive style or manner by which it operated its business. *See* Pl. Post–Trial Br. at 13–14; Pl. Resp. Def. Supp. Trial Br. at 3–4. Heritage also contends that APT's comparisons of advertisements published by Environ and APT are irrelevant to the "misappropriation of advertising ideas" offense in the absence of any allegations by Environ regarding the purported similarity in advertising. Upon careful consideration of Environ's allegations in light of

the policy's language, we conclude that APT has failed to demonstrate that Environ's allegations even potentially trigger coverage under the "misappropriation of advertising ideas or style of doing business" advertising injury offenses.

APT does not attempt to define the phrase "misappropriation of advertising ideas or style of doing business," but Environ's allegations fall outside its rubric even if we read the phrase in its broadest sense. The phrase clearly incorporates two offenses, misappropriation of advertising ideas and misappropriation of style of doing business. While APT is silent on potential definitions, various courts have directly addressed the question, often disagreeing about the breadth of "misappropriation." Some courts define the term narrowly and technically to track the common-law tort of misappropriation (*see Advance Watch Co. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795, 802 (6th Cir.1996)), while others define the term generally and in its lay sense to mean "to take wrongfully." *See Winklevoss Consultants, Inc. v. Federal Ins. Co.*, 991 F.Supp. 1024, 1037–38 (N.D.Ill.1998) (*citing Lebas Fashion Imports v. ITT Hartford Ins. Group*, 50 Cal. App.4th 548, 561, 59 Cal.Rptr.2d 36 (Cal. Ct.App.1996)). However, even if we adopt the broadest sense of misappropriation ("to take wrongfully") in the context of "adverting idea" (never mind "style of doing business" for the moment) and combine it with the Seventh Circuit's definition of advertising ("active solicitation of business," *see Erie Insurance Group, supra*), we have, as the court in *Winklevoss* described, the following definition of "misappropriation of advertising ideas": the insured wrongfully took an idea about the solicitation of business. *See Winklevoss*, 991 F.Supp. at 1038; *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 748 (3rd Cir.1999) (approvingly citing the *Winklevoss* definition of advertising idea). We consider this definition an unstrained and plain reading of the language in the Heritage–APT policy, as well as one that favors the insured. *See also Zurich Ins.*

*Co. v. Sunclipse, Inc., supra*, 85 F.Supp.2d 842, 854 (N.D.Ill.2000) (recognizing misappropriation of an advertising idea to mean "the wrongful taking of the manner in which another advertises its goods or services") (internal quotations and citations omitted); *Atlantic Mut. Ins. Co. v. Badger Med. Supply Co.*, 191 Wis.2d 229, 528 N.W.2d 486, 490 (Ct.App.1995) (defining advertising idea as "an idea calling public attention to a product or business, especially by proclaiming desirable qualities so as to increase sales or patronage").

This broad definition provides no solace for APT, however, since Environ's complaint fails to even hint at APT's wrongful taking of any Environ idea about how to solicit business or advertise the piping product. The only Environ allegation relating to advertising is found in paragraph 40 of its complaint (Count III, federal unfair competition), where Environ claim that APT's "marketing of its POLY–TECH piping system as 'patent pending' creates a cloud over the ownership of the Invention." Def. Ex. 21 (Environ Compl. ¶ 40). This allegation is void of any reference to Environ's ideas on how to solicit business, nor does it mention APT improperly taking such an idea.

The Third Circuit recently considered a case noticeably similar to the one at bar, concluding that the allegations in the underlying complaint against the insured did not fall within the advertising injury offense of "misappropriation of advertising ideas." *See Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 748 (3rd Cir.1999). In *Frog, Switch*, the insured sought a declaration that its insurer had a duty to defend it against a lawsuit brought by a competitor for theft of trade secrets, unfair competition and reverse passing off under the Lanham Act. In the underlying complaint, the plaintiff alleged that the insured had used misappropriated trade secrets and confidential information, including drawings and prints related to a dipper bucket product, to enter the dipper

bucket product market. The plaintiff further alleged that the insured launched a widespread promotional campaign, in which the insured both falsely represented that it had developed a new and revolutionary design for dipper bucket parts and components and falsely depicted a dipper bucket with the insured's logo. *Id.* at 745. The plaintiff contended that the insured's actions misled consumers into believing that the plaintiff's bucket products could be replicated, produced and sold by the insured. The plaintiff also claimed that the buckets the insured advertised were made using the stolen drawings, a form of "reverse passing off," according to the plaintiff. *Id.*

Chief Judge Becker, writing for a unanimous court, concluded that the insurer had no duty to defend the insured since the plaintiff's unfair competition and Lanham Act claims did not qualify as allegations of misappropriation of advertising ideas or style of doing business. He reasoned that "the allegation that [the insured] engaged in unfair competition by misappropriating trade secrets relating to manufacture of a product line does not allege misappropriation of advertising ideas or styles of doing business as such." *Id.* at 748. He concluded that the insured's alleged misappropriation of the bucket design, as well as its alleged advertising lies about the bucket design's origin, did not qualify as allegations that the insured took an idea about advertising. *Id.*

We find the persuasive reasoning in *Frog, Switch* applicable here, and similarly consider the allegations in Environ's unfair competition, conversion, and other counts insufficient to give rise to APT's duty to defend under the "misappropriation of advertising ideas" offense in the Heritage–APT policy. Environ simply does not claim that it ever used the phrase "patent pending" as an advertising idea, that it ever considered "patent pending" an idea for soliciting business, or that the piping product that APT allegedly took was inherently an idea on how to advertise.

Rather, Environ alleged that APT unfairly competed with it by stealing its product and claiming the piping as its own, a distinctly different claim from alleging that APT took an idea about how to solicit business or advertise the underground piping product. *See Applied Bolting Tech. Prods., Inc. v. United States Fidelity & Guar. Co.*, 942 F.Supp. 1029, 1034 (E.D.Pa. 1996) (distinguishing between advertising falsely and taking an advertising idea), *aff'd*, 118 F.3d 1574 (3rd Cir.1997); *Frog, Switch*, 193 F.3d at 749 (*citing Applied Bolting* ).

Oddly, the only argument that APT advances in respect to the "advertising idea" offense completely ignores the language of the complaint itself. Perhaps sensing that Environ never alluded to misappropriation of an advertising idea, APT resorts to having its expert compare Environ's advertisements of its piping product to the two APT advertisements attached to Environ's complaint. APT then claims that because, in its view, the advertisements are similar in some respects, Heritage's duty to defend is triggered under the "advertising idea" offense. However, this argument lacks an essential element—any allegation *by Environ* that APT has absconded with certain aspects of its advertising. In fact, Environ neither mentions its own advertisements nor compares them in any respect to APT's advertising. APT attempts to manufacture an "advertising idea" offense from thin air, an effort we reject in the absence of any allegations from Environ to that effect.

Next, in regard to the "misappropriation of … style of doing business" offense, APT has not attempted to define the phrase, to argue that it is ambiguous, or to suggest that Environ has contended that APT took its overall "style" of operating its business. This failure alone forecloses any claim that Heritage owes APT a duty to defend based on that offense, especially in light of APT's burden to demonstrate the existence of advertising injury coverage in the first instance. Nonetheless, lest

we leave any stone unturned, we independently have not located any allegation in Environ's complaint that potentially would qualify under that offense.

■ As for the definition of "style of doing business," we concur with the vast majority of courts that have ascribed to the phrase a plain and working meaning when it is read in context—a style of doing business is a "company's comprehensive manner of operating its business." *See, e.g., Novell, Inc. v. Federal Ins. Co.,* 141 F.3d 983, 987 (10th Cir.1998) (recognizing some variation in defining the phrase "style of doing business" in the 1986 CGL policy, but noting that "[m]ost [courts] seem to agree that the phrase 'style of doing business' unambiguously refers to 'a company's comprehensive manner of operating its business'") (collecting authorities); *Applied Bolting,* 942 F.Supp. at 1034 (holding that style of doing business refers to a company's comprehensive manner of operating or conducting its business) (collecting similar authorities), *aff'd,* (3rd Cir.); *St. Paul Fire & Marine Ins. Co. v. Advanced Interventional Sys., Inc.,* 824 F.Supp. 583, 585 (E.D.Va.1993) (same definition), *aff'd,* 21 F.3d 424, 1994 WL 118029 (4th Cir.1994); *Atlantic Mut. Ins. Co. v. Badger Med. Supply Co., supra,* 191 Wis.2d 229, 528 N.W.2d 486, 490 (Ct.App. 1995) (same definition and agreeing that the phrase may include distinctive sales techniques); *Advance Watch,* 99 F.3d at 801–02 (6th Cir.) (agreeing with the court's analysis in *Badger* ); *Elcom Techs., Inc. v. Hartford Ins. Co. of the Midwest,* 991 F.Supp. 1294, 1297 (D.Utah 1997) (same definition and finding that "acts by one company might amount to a comprehensive manner of operating its business while

the same acts by another company may only be considered representations to the public about the company's product or service"); *American States Ins. Co. v. Vortherms,* 5 S.W.3d 538, 543 (Mo.Ct.App.1999) (same definition); *Fluoroware, Inc. v. Chubb Group of Ins. Cos.,* 545 N.W.2d 678, 682 (Minn.Ct.App.1996) (same definition); *cf. Winklevoss,* 991 F.Supp. at 1039.

Other courts have adopted slightly more specific variants of this general meaning, but the basic connotations of those definitions remain largely the same. *See, e.g., Frog, Switch,* 193 F.3d at 749–50 (finding that style of doing business refers to "a plan for interacting with consumers and getting their business," and recognizing that copying a particular product fails to constitute copying an overall style of doing business); *Owens–Brockway Glass,* 884 F.Supp. at 369 (defining the phrase as the "outward appearance or signature of a business"), *aff'd,* 94 F.3d 652, 1996 WL 445082 (9th Cir.).

Most courts have equated the phrase "misappropriation of ... style of doing business" to trade dress infringement since, for example, a business' total image and comprehensive style of doing business could become inherently distinct and recognizable.[7] *See, e.g., Fluoroware,* 545 N.W.2d at 683. Yet, other courts (as we alluded to earlier) have refused to read misappropriation beyond its technical, narrow sense, finding that the phrase cannot include trademark or trade dress infringement. *Compare, e.g., Dogloo, Inc. v. Northern Ins. Co. of New York,* 907 F.Supp. 1383, 1389–90 (C.D.Cal.1995) (holding that trade dress infringement claim, in which insured was expressly alleged to have misappropriated and adver-

---

7. For example, a restaurant's comprehensive manner of operating its business could involve such items as the type of cuisine served, the configuration and outward appearance of the restaurant, the quality or speed of service provided (e.g. fast-food vs. dine-in), any thematic aspect of the dining experience (e.g. employees clad in Mexican garb, serving food and alcoholic beverages during a movie or dinner theater), or other unique attributes

that contribute to the overall business identity. A single product in a product line could be a unique selection on the menu or a type of drink. Likewise, an example of an advertising idea could be an innovative television commercial designed to publicize a new menu selection (e.g. Taco Bell's advertising concept of a Spanish-speaking chihuahau endorsing new products).

tised the unique configuration of a dome-shaped dog house, could constitute the offense of misappropriating a style of doing business) *with Atlantic Mutual. Ins. Co. v. Badger,* 528 N.W.2d at 490 (finding that misappropriation of style of doing business was distinct from trade dress infringement since trade dress infringement requires a likelihood of confusion, while the tort of misappropriation—the narrow definition of misappropriation—has no such confusion requirement); *see Novell,* 141 F.3d at 987 (comparing various courts' approaches to trade dress infringement in connection with "misappropriation of style of doing business," concluding that none of the allegations in the underlying plaintiff's unfair competition and other counts fell under any definition of "style of doing business"); *Frog, Switch,* 193 F.3d at 749 (even assuming trademark and trade dress qualified as a "style of doing business," the underlying plaintiff's allegations of unfair competition and reverse passing off of a dipper bucket design did not entail a claim for infringement of trademark or trade dress).

This divergence in case law on some aspects of the trade dress issue is irrelevant here, however, since Environ has not alleged a claim for trademark or trade dress infringement. Moreover, none of Environ's allegations fall within any of the slight variations of the definition of wrongfully taking a "style of doing business" that we have described. The only Environ allegation even tangentially implicating advertising is its claim that APT used the "patent pending" designation in its marketing materials. While we can imagine scenarios in which the physical appearance of a company's marquee product is so inherently distinctive and widely adopted by the company that the product itself reflects the company's comprehensive manner of operating its business, those types of allegations are not before us now, nor does APT suggest that they are.

Significantly, Environ says nothing about the depictions in the two APT advertisements, nor does it contend that APT's depictions reflected its comprehensive style of operating its company. Neither Environ, in its complaint, nor APT, in its briefs, informs us about the nature of Environ's overall business, the number of products that Environ produces, whether the piping product in APT's advertisement represents Environ's marquee product or overall signature, whether the depicted product reflects Environ's plan for interacting with consumers and getting their business, or how Environ generally operates its business and presents itself to the public. Environ's mere allegation of APT's use of the phrase "patent pending" may reflect Environ's concern that APT was attempting to secure rights over aspects of one product that Environ believed that it owned, but we have nothing before us to draw the conclusion that Environ alleged that APT wrongfully took its comprehensive method of operating its business (whatever the nature of that business may be). *See Frog, Switch,* 193 F.3d at 749–50 (finding that the underlying plaintiff alleged that insured copied a particular product line that might have been attractive to customers, but that plaintiff failed to allege that the insured copied a style of doing business); *St. Paul Fire & Marine,* 824 F.Supp. at 585 (noting that stealing patents used in the manufacture of a single device "does not even approach the showing of pervasive similarity in the overall manner of doing business that courts have previously recognized as necessary to prove misappropriation of a 'style of doing business'"), *aff'd,* (4th Cir.).

 Instead of directly addressing the "style of doing business" language in the policy, APT attempts an end-run around its ordinary meaning by drawing upon extrinsic evidence to find coverage under that offense. APT asserts that the phrase actually includes the offenses of "piracy" and "unfair competition," two terms that were eliminated from the 1986 CGL policy when it replaced its predecessor, the 1976 version. While we need not, and cannot, rely on extrinsic evidence in the face of

what we have determined as unambiguous policy language (*see Samar*, 726 N.E.2d at 1290), we will briefly explain why this argument would fail even if an ambiguity existed.

■ APT relies upon its expert to conclude that the 1986 CGL policy revision was not intended to change the scope of coverage for advertising injury provided in the 1976 CGL policy.[8] Therefore, according to APT, the elimination of the terms piracy and unfair competition, and the concomitant addition of the phrase "misappropriation of advertising ideas or style of doing business," must mean that the latter phrase equates to the former terms.[9] APT then reasons that regardless of what the phrase "misappropriation of advertising ideas or style of doing business" *actually says*, its definition really tracks the broadest meanings of piracy and unfair competition. Thus, APT concludes that

piracy and unfair competition encompass Environ's patent infringement[10] and unfair competition claims, thereby triggering Heritage's duty to defend under the "misappropriation of advertising ideas or style of doing business" offenses.

We find this argument specious for a number of reasons, only one of which we need elaborate upon here. APT's contention expands the meaning of piracy and unfair competition as if an *advertising injury* policy never existed, while ignoring that the change actually reflects that those terms likely had very narrow meanings in the old policy. *See Curtis–Universal*, 43 F.3d at 1123 (interpreting the unfair competition language in the pre–1986 CGL policy; finding that the "broad interpretation of [unfair competition] cannot be right for the insurance policy in our case. It would turn insurance against liability for 'advertising injury' into insurance against liability for antitrust violations"); *Wes-*

**8.** APT's expert refers to an ISO circular to conclude that ISO did not intend to change the scope of advertising injury coverage when it modified the 1986 CGL policy. He testified that the changes in language to the 1986 CGL policy were motivated, in part, by a desire to simplify the policy language to "plain English." The expert also based his opinions on "secret" ISO drafting history and conversations with an individual involved in the drafting of the 1986 policy (that individual did not testify)—sources which, while germane to any conclusions he reached, provide us little incentive to place much weight on his opinions even if they were relevant.

**9.** Several courts have refused to consider such coverage arguments based on extrinsic evidence where the language of the policy is unambiguous. *See, e.g., SST Fitness Corp.*, 182 F.3d at 450 n. 1 (6th Cir.); *Mez Indus., Inc.*, 76 Cal.App.4th at 872 n. 15, 90 Cal. Rptr.2d 721; *cf. Curtis–Universal*, 43 F.3d at 1123 ("It would be odd if an insured had to do legal history to figure out the scope of its insurance coverage.").

**10.** As we have mentioned, APT has not advanced an argument directly predicated on an interpretation of the language "misappropriation of ... style of doing business," such as by claiming that Environ's patent infringement claims qualify as an allegation that APT misappropriated Environ's style of doing

business. (APT's only patent infringement contention under this offense is an indirect claim that patent infringement is a type of piracy or unfair competition, which in turn is a subset of the style of doing business offense.) However, even if APT did assert a direct claim that patent infringement was tantamount to misappropriation of style of doing business, it would fail. We agree with the many courts that have concluded that direct and induced patent infringement fails to qualify under the offense of "misappropriation of ... style of doing business." *See, e.g., St. Paul Fire & Marine*, 824 F.Supp. at 586, 587 ("[I]t is nonsense to suppose that if the parties had intended the insurance policy in question to cover [direct and induced] patent infringement claims, the policy would explicitly cover infringements of 'copyright, title or slogan,' but then include patent infringement, sub silentio, in a different provision, by reference to 'unauthorized taking of ... [the] style of doing business' "), *aff'd* (4th Cir); *Mez Indus.*, 76 Cal.App.4th at 872–73, 90 Cal. Rptr.2d 721; *Tradesoft*, 329 N.J.Super. at 150–51, 746 A.2d 1078; *Gencor*, 857 F.Supp. at 1564; *Owens–Brockway Glass*, 884 F.Supp. at 367, 369, *aff'd*, (9th Cir.). In any event, as we explained above, we have considered Environ's specific allegations in the context of the unambiguous language of the two "misappropriation" offenses and have concluded that Environ has not alleged a "misappropriation" offense.

*towne Shoes, Inc. v. City Ins. Co.,* No. 95–2328, 1996 WL 175084, at *3 (7th Cir. Apr. 11, 1996) (addressing language in the pre–1986 CGL policy and recognizing the impulse to interpret "unfair competition" narrowly in light of the word advertising, rather than broadly as the modern law of business torts might allow); *Fluoroware,* 545 N.W.2d at 683 (interpreting piracy in pre–1986 CGL policy and concluding that piracy did not include patent infringement; holding that "[i]n the context of policies written to protect against claims of advertising injury, piracy means misappropriation or plagiarism found in the elements of the advertisement itself—in its text form, logo, or pictures—rather than in the product being advertised") (internal citations and quotation omitted). Hence, in the 1976 CGL policy, unfair competition and piracy that involved the taking of an advertising idea or style of doing business likely was covered, while, for instance, unfair competition involving antitrust violations was not. *Id.* In other words, assuming arguendo that there was no change in the scope of advertising injury coverage in the 1976 and 1986 CGL policies, the alteration of policy language in the 1986 policy says more about the limited meanings of unfair competition and piracy in the old policy than it does about a broad definition of the two "misappropriation" offenses in the new policy. Of course, this entire discussion turns a blind eye to the fact that equating "misappropriation of advertising ideas or style of doing business" to "unfair competition" and "piracy" ignores the obvious reality that those two terms no longer appear in the 1986 CGL policy.

Ultimately, APT's collateral attempt to envelop the broad definitions of piracy and unfair competition within the "misappropriation of advertising ideas of style of doing business" umbrella must fail—the offenses simply do not appear in the policy language and, to the extent that any remnants of their narrow meanings may remain in the policy, they are reflected in the unambiguous language as it now exists. In addition to the absence of any argument from APT regarding the definition or interpretation of the actual language "misappropriation of . . . style of doing business," we have independently reviewed Environ's allegations and find them to fall outside the plain meaning of this offense. Accordingly, Heritage has no duty to defend APT under either offense of the "misappropriation of advertising ideas of style of doing business" coverage provision.

### 3. Disparagement and invasion of privacy offenses

APT claims in abbreviated fashion that Environ's allegations fall within the remaining two categories of advertising injury offenses: "[o]ral or written publication of material that . . . disparages a person's or organization's goods, products or services," and "[o]ral or written publication of material that violates a person's right of privacy." *See* Def. Resp. Pl. Post–Trial Br. at 3–5; Pl.Ex. 10.[11]

As for the disparagement offense, APT contends that Environ, in the underlying complaint, alleged that APT disparaged Environ's goods or products by claiming (again in ¶ 40) that "APT's marketing of its POLY–TECH piping system as 'patent pending' creates a cloud over the ownership of the Invention . . . [causing] injury in terms of the loss of clearly understood title to the Invention." Def. Ex. 21. We disagree. APT neglects to define "material . . . that disparages . . . goods, products or services," but we do not consider the plain and ordinary meaning of the word "disparage" particularly difficult to discern.

---

11. In its post-trial brief, APT does not discuss the disparagement or invasion of privacy offenses, except for stating in a footnote that it had discussed the elements of those offenses in its trial brief. *See* Def. Post–Trial Br. at 21 n.12. However, APT also failed to analyze or develop these claims in its trial brief, which leaves APT's response to Heritage's post-trial brief, where APT at least specifically mentions the offenses, although without much development of the issues.

Black's Law Dictionary (7th ed.1999) defines disparage as "[t]o dishonor (something or someone) by comparison" or "[t]o unjustly discredit or detract from the reputation of (another's property, product, or business)." The American Heritage Dictionary (2d college ed.1991) defines the term as "[t]o speak of as unimportant or small; belittle" or "to reduce in esteem or rank." Webster's Third New International Dictionary (unabridged 1993) similarly defines disparage as "to lower in esteem or reputation" or "to speak slightingly of." Likewise, under Indiana law, disparage has been defined as to "lower in esteem; discredit." *See Indiana Ins. Co. v. North Vermillion Community Sch. Corp.*, 665 N.E.2d 630, 635 (Ind.Ct.App.1996) (holding that insurer's duty to defend was triggered under personal injury disparagement clause where underlying plaintiff alleged that insured injured him by damaging his good reputation in the community and by harassing, embarrassing, and subjecting him to ridicule and humiliation by others) (*citing* Webster's New World Dictionary (3rd ed.1988)). Hence, we look to Environ's allegations to determine if it alleged that APT denigrated, discredited or belittled Environ's products in the course of advertising.

■■■ Environ's only allegation involving advertising involves APT's use of the phrase "patent pending" in its advertisements, which Environ believes clouds ownership of the invention. As we have said, one of Environ's central claims is that APT stole aspects of its piping product, eventually advertising the product as its own. Importantly, Environ never contends that APT's advertisements mention Environ, compare the products of the respective companies, or discredit or denigrate Environ's piping products. Nor does Environ claim that APT advertised its product under Environ's name or label. In fact, APT's advertisements never refer to Environ or any other competitor. While Envi-

ron surely complains that APT improperly made off with its product, Environ simply fails to claim that APT said anything negative about its piping, which negative connotation is, after all, the essence of disparagement. The insured's lack of any direct reference to a competitor's goods or products repeatedly has compelled courts to find that the underlying plaintiff has not alleged an advertising injury under this disparagement offense. *See Frog, Switch,* 193 F.3d at 748 (underlying plaintiff's claims of reverse passing off and unfair competition did not constitute disparagement of the underlying plaintiff's product; "nothing in the [the underlying plaintiff's] complaints alleged that [the insured] said anything disparaging about [the plaintiff's] products"); *U.S. Test,* 196 F.3d at 1382 (underlying counter-plaintiff alleged that the insured improperly solicited customers by claiming that its allegedly infringing product did not, in fact, infringe the counter-plaintiff's patents; court found that counter-plaintiff's allegations were "legally inadequate to constitute disparagement, as there is no allegation that [the insured] falsely denigrated [the counter-plaintiff's] products"); *Zurich,* 85 F.Supp.2d at 847, 855–56 (underlying plaintiff alleged that insured misappropriated trade secrets, developed a competing product and sold the stolen competing product instead of the plaintiff's original product; court found that although plaintiff alleged that insured developed and sold the stolen product to the plaintiff's customers and therefore treated the plaintiff's original product unfairly, the plaintiffs did not allege that the insured made false or misleading statements about the plaintiff's products); *Winklevoss,* 991 F.Supp. at 1039–40 ("There is nothing in the complaint to suggest that [the insured] said anything at all about [the underlying plaintiff]—let alone anything negative and misleading—or did anything other than promote its own product.").[12]

---

12. APT contends that under certain Lanham Act claims, a direct comparison between

products is unnecessary to prove such claims. Perhaps so, but those cases neither involve

While we believe that some direct reference to the competitor's product is necessary to fall within the plain meaning of "disparage," we also do not view Environ's allegations as resulting in a reasonable claim of implied disparagement either. The phrase "patent pending" signifies nothing about the quality or state of Environ's product, as the phrase means exactly what it says—a patent is pending. This case might be different if APT had advertised that it actually owned a patent and then claimed that Environ's products infringed APT's patent, but we have none of these allegations before us. That example of disparagement may not be direct, as APT would not have said anything about the actual nature of Environ's product (e.g. the product is of inferior quality or functions poorly), but the disparagement could be by implication since APT would be claiming that Environ products infringed the one and only valid patent on the product. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 128, at 966–67 (5th ed.1984) (describing the disparagement tort as an injurious falsehood, recognizing the above example of disparagement by implication, and noting the requirement that the disparaging statement be false). Even in the unlikely event that consumers would somehow connect APT's advertised product with Environ's product (to which APT's advertisements do not refer, let alone discredit), the phrase "patent pending" does not equate to saying by implication that Environ's products are inferior, that the claims in APT's patent application are equivalent to the claims in Environ's patent, or that Environ's patent is invalid. On the contrary, patent applications often do not mature into valid patents, and simply filing such applications confers absolutely no legal rights to a product whatsoever. The Federal Circuit has explicated this long-standing observation:

> A 'patent pending' notice gives one no notice whatsoever. It is not even a guarantee that an application has been filed. Filing an application is no guarantee any patent will issue and a very substantial percentage of applications never result in patents. What the scope of claims in patents that do issue will be is something totally unforeseeable.

*State Industries, Inc. v. A.O. Smith Corp.,* 751 F.2d 1226, 1236 (Fed.Cir.1985); *Schwebel v. Bothe,* 40 F. 478 (E.D.Mo. 1889) (" 'Patent applied for,' did not signify that the article was then and there protected by letters patent. It conveyed no such representation to the public... [p]atents are applied for on many articles that are never granted. Perhaps as many applications for patents are denied as are granted."); *cf. Micro Chemical, Inc. v. Great Plains Chem., Co.,* 194 F.3d 1250, 1261 (Fed.Cir.1999) ("Pre-issuance activities alone cannot establish inducement to infringe."); 35 U.S.C. § 154(a) (rights flowing from a patent grant shall "begin[ ] on the date on which the patent issues"); Michael A. Shimokaji, "Inducement and Contributory Infringement Theories to Regulate Pre–Patent Issuance Activity," 37 IDEA: J.L. & Tech. 571, 542 (1997).

In addition to the lack of direct or implied disparagement, we find a further, independent reason why Environ's allegations regarding APT's marketing do not qualify as an advertising injury offense. Environ never alleges an essential component of a disparagement claim, namely, that APT made a false statement in the course of advertising. *Cf. Kitco, Inc. v. Corporation For General Trade,* 706 N.E.2d 581, 587 (Ind.Ct.App.1999) ("In order to recover in an action for defamation, that which caused the alleged defamation must be both false and defamatory."); Prosser and Keeton, § 128, at 967–68. The only statement relating to advertising about which Environ complains, "patent pending," was not false at all. *Cf.* 35 U.S.C. § 292 (false marking statute) (pe-

the tort of disparagement nor address the specific disparagement language in the type of advertising injury CGL policies at issue in this case.

nalizing false marking of patents in advertising and noting that whoever advertises a product as "patent applied for" or "patent pending" is liable for false marking *if* "no application has been made, or if made, is not pending"). In fact, that statement was accurate and truthful in light of APT's having filed a patent application in March 1992 that was still pending when APT published those advertisements. *See Wayne Township Bd. of Sch. Comm'rs v. Indiana Ins. Co.,* 650 N.E.2d 1205, 1208 (Ind.Ct.App.1995) (holding that when the underlying factual basis of the complaint, even if proved true, would not result in liability under the insurance policy, the insurer can properly refuse to defend). Environ clearly is displeased that APT both filed a patent application (albeit well before Environ's patent issued) for a product that it claims it owns and advertised that product as "patent pending." But that fact does not translate into allegations that APT's advertisements contain false and discrediting representations about Environ's products. Nothing about the two APT advertisements attached to Count I of Environ's complaint has been alleged to be false. In the end, we simply cannot reasonably conclude that Environ's allegation that APT marketed its product as "patent pending" constitutes a claim of disparagement within the plain meaning of the Heritage–APT policy.

■ As a final matter, APT claims that Environ's allegations qualify under the advertising injury offense "[o]ral and written publication of material that violates a *person's* right of privacy." Pl.Ex. 10 at 7/9 (emphasis added); *see* Def. Resp. Pl. Post–Trial Br. at 4–5. We find this contention unavailing for three reasons. First, Environ never expressly or implicitly refers to a violation of the right of privacy and APT fails to identify or explain under which branch of the tort Environ's allegations

supposedly fall. *See Doe v. Methodist Hosp.,* 690 N.E.2d 681, 687–91 (Ind.1997) (explaining four categories of invasion of privacy tort and expressing hesitance to ever impose liability under the Indiana Constitution for truthful statements). Second, we take note that "[n]ot one case has ever held that trade secret misappropriation falls within [this] covered offense," nor does APT cite such authority. *Winklevoss,* 991 F.Supp. at 1040. Finally, the insurance policy's coverage for invasion of the right of privacy, by its own terms, applies only to a "person's," not an "organization's," right of privacy. The policy distinguishes between person and organization in at least two different locations: (1) in the immediately preceding advertising injury offense, which provides coverage for material that "slanders or libels a person or organization or disparages a person's or organization's goods . . . ," and (2) in the clause providing for an advertising injury coverage limit in the amount of $1,000,000 per "Any One Person or Organization."

APT, of course, is an organization, a fact disqualifying it for potential coverage under this advertising injury offense. APT contends that Indiana's insurance statute defines a corporation as an artificial person. Maybe so, but we need not resort to such extrinsic sources where the meaning of the policy language is plain on its face. Yet, even if we adopted this definition, it would render the term "organization" mere surplusage, a result at odds with Indiana's rules of contract construction, for every corporation, association and partnership (*see* I.C. § 27–1–2–3(h)), the vast majority of "organizations" seeking CGL insurance coverage, would be covered under the term "person." [13] Therefore, we conclude that Environ's allegations fail to trigger Heritage's duty to defend under the

---

**13.** Moreover, this definition runs afoul of the traditional notion that the right of privacy attaches to individuals, much like the Fourth Amendment's protections apply to "people" and "persons." *Cf.* L. TRIBE, AMERICAN CONSTITUTIONAL LAW 775–76 (2d ed.1988) (explaining that the right of privacy partially derives from the penumbra of the Fourth Amendment).

"right of privacy" advertising injury offense in the Heritage–APT policy.

Overall, APT has failed to demonstrate that any of the allegations in Environ's complaint fall within the meaning of the four categories of advertising injury offenses enumerated in the Heritage–APT policy. Hence, as predicted under Indiana law, we find that Heritage has no duty to defend APT against Environ's allegations in the underlying Pennsylvania action.[14]

### Judicial Admissions/Bad Faith/Loss in Progress

The parties advance a number of final issues that warrant some discussion. First, APT claims that Heritage judicially admitted (in *Heritage's* November 2, 1998, motion for summary judgment) that Environ's allegations fall within the advertising injury coverage grant in the policy.[15] *See* Def. Trial Br. at 19; Post–Trial Br. at 21–22. Heritage did no such thing. *See Solon v. Gary Community Sch. Corp.*, 180 F.3d 844, 858 (7th Cir.1999) ("Judicial admissions are formal concessions in the pleadings ... A judicial admission is conclusive, unless the court allows it to be withdrawn."). While Heritage predicated that particular summary judgment motion on the first publication exclusion, it did not unequivocally abandon its initial coverage position that Environ's allegations fell outside the policy's advertising injury offenses. *See Medcom Holding Co. v. Baxter Travenol Lab., Inc.*, 106 F.3d 1388, 1404 (7th Cir.1997) (citing authority requiring judicial admissions to be deliberate, clear and unequivocal statements). Moreover, it becomes obvious that when the "admission" is read in the context of the brief in which it appears and in light of Heritage's Reply, the coverage issue was still quite in controversy. *See* Heritage Reply Br. at 1, 5 n.1 (arguing that patent infringement did not constitute advertising injury in the first instance). We expressly noted at two locations in our summary judgment entry that we were assuming for purposes of that entry only that Environ's allegations qualified as an advertising injury, recognizing that the parties would no doubt argue the initial coverage position if the case survived to trial. *See* Court's February 1, 1999, Entry at 8 n.1, 19 n.2. Accordingly, we find that Heritage did not formally concede the initial coverage question.

Next, both parties attempt to raise new defenses and claims that they neither identified in their original complaints and answers nor developed in any substantive fashion until after trial. APT moves to amend its counter-claim to conform to the evidence adduced at trial, claiming that Heritage denied coverage in bad faith by not sufficiently investigating APT's claim. *See* Def. Br. Support Mot. Amend Counter–Claim at 2. Heritage invokes the "loss in progress" doctrine for the first time in its post-trial brief, contending that any alleged advertising injury existed before inception of the Heritage–APT policy and continued into the policy period, relieving Heritage of any duty to defend.

▆▆▆ As for APT's bad faith contention, it has not only been delinquently raised (a fact we identified in our pre-trial rulings as the argument precipitously surfaced before trial) but it also was not tried expressly or

---

14. Given our conclusion that APT has not demonstrated that Environ's allegations trigger Heritage's duty to defend under one of the four categories of advertising injury offenses in the Heritage–APT policy, we need not consider whether Heritage has proven that the first publication exclusion bars coverage.

15. The alleged "admission" that APT cites out of context reads, "As discussed further below, Environ's allegations fall within the scope only of the personal injury or advertising injury liability coverage contained within the Heritage policies." Heritage's Br. Support Summ. J. at 2 (introductory paragraph). When one examines the same subject matter when "discussed further below," it becomes clear that Heritage made this statement to emphasize that *only* advertising injury coverage was at issue—as opposed to the "bodily injury/property damage" provisions that also existed in the policy. *Id.* at 9.

impliedly by Heritage. More importantly, the claim itself lacks merit. Under Indiana law, "the lack of diligent investigation alone is not sufficient to support an award" for bad faith. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 520 (Ind.1993); *Worth v. Tamarack American*, 47 F.Supp.2d 1087, 1102 (S.D.Ind.1999) (summarizing Indiana law), *aff'd*, 210 F.3d 377, 2000 WL 101227 (7th Cir.2000). "[A] good faith dispute about ... whether the insured has a valid claim at all will not supply the ground for a recovery in tort for the breach of the obligation to exercise good faith ... even if it is ultimately determined that the insurer breached its contract." *Erie*, 622 N.E.2d at 520. An insurer may be considered to have acted in bad faith where it "denies liability knowing that there is no rational, principled basis for doing so." *Id.* Yet, poor judgment or negligence do not amount to bad faith since the "additional element of conscious wrongdoing must also be present." *Colley v. Indiana Farmers Mut. Ins. Group*, 691 N.E.2d 1259, 1261 (Ind.Ct.App.1998).

■ The evidence adduced at trial comes nowhere close to demonstrating that Heritage engaged in a negligent denial of APT's claim, much less that Heritage engaged in the requisite conscious wrongdoing when denying coverage. While it is apparent that some of Heritage's employees did not possess institutional knowledge about ISO's drafting history (an unsurprising fact given much of its "secret" nature), and that they could endeavor to learn more about ISO's CGL form policies, Heritage did promptly retain coverage counsel upon receiving APT's tender of defense. APT's December 18, 1995, letter requesting coverage included Environ's summons and complaint in the underlying action. *See* Def. Ex. 2. Within approximately one month of receiving that letter, Heritage's coverage counsel responded with a denial of coverage, detailing the insurance provisions at issue and discussing the nature of Environ's allegations in the underlying lawsuit. *See* Def.

Ex 3. Specifically, coverage counsel explained that Environ's patent infringement claims did not constitute an advertising injury within the meaning of the policy and that Environ failed to allege that APT disparaged Environ's products. *Id.* Coverage counsel also requested that if APT believed that any further information would influence the coverage decision, it should forward that information for consideration. *Id.* On February 27, 1996, APT responded by letter to the initial denial of coverage, reiterating its position and citing legal authority in support of its tendered defense. *See* Def. Ex. 4. On March 11, 1996, Heritage's coverage counsel again responded in writing, disputing the holdings of the authority cited by APT, reasserting the absence of coverage based on Environ's allegations, disagreeing with APT's choice of law position, and again declining to assume APT's defense. *See* Def. Ex. 5.

In light of these facts, Heritage's conduct strikes us as sufficiently reasonable under the circumstances of this case, and, as it turns out, correct as a matter of legal contract interpretation. Heritage retained coverage counsel, who clearly examined the insurance policy provisions at issue, the allegations in the underlying complaint, and the legal authority offered by the insured in support of its coverage position. The reasons supplied for denial of coverage were rational and understandable given the core documents driving the litigation and the legal principles that we have identified in this entry. The facts presented at trial fail to raise even an inference that Heritage acted in bad faith and engaged in conscious wrongdoing, and they certainly fail to prove that proposition by a preponderance of the evidence. Accordingly, we *DENY* APT's motion to amend its counter-claim. Alternatively, since we have considered the merits of the bad faith claim in affording APT the benefit of the doubt, we find in Heritage's favor.

Finally, Heritage's "loss in progress" argument constitutes an affirmative defense that it delinquently raised for the first time in its post-trial brief, so we shall not consider it further, although the issue is moot in any event. *See Stonehenge Engineering Corp. v. Employers Ins. of Wausau*, 201 F.3d 296, 302 (4th Cir.2000).

### Conclusion

For the reasons discussed, we predict that if Indiana's highest court had resolved this case, it would have determined that Heritage has no duty to defend its insured, APT, in the underlying action brought against APT in the Eastern District of Pennsylvania. The allegations in Environ's underlying complaint fail to trigger Heritage's duty to defend under any of the advertising injury offenses in the Heritage–APT CGL policy. Also, APT's motion to amend its counter-claim to conform to the evidence is *DENIED*.

### JUDGMENT

As explained in the accompanying Entry in the above-named cause, judgment is hereby entered in favor of Plaintiff, Heritage Mutual Insurance Company, and against Defendants, Advanced Polymer Technology, Inc., Leo J. LeBlanc, and Environ Products, Inc. Each party shall bear their own costs.