746 A.2d 1078 (2000)
329 N.J. Super. 137
TRADESOFT TECHNOLOGIES, INC., Plaintiff-Respondent,
v.
The FRANKLIN MUTUAL INSURANCE COMPANY, INC., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 1, 2000.
Decided March 13, 2000.
*1080 Anthony P. Pasquarelli, Rahway, for defendant-appellant (Sweet, Pasquarelli & Wiebalk, attorneys; Mr. Pasquarelli, on the brief).
Carl E. Ailara Jr., for plaintiff-respondent.
Before Judges PRESSLER, LANDAU and CIANCIA.
*1079 The opinion of the court was delivered by PRESSLER, P.J.A.D.
This declaratory judgment action arises out of the advertising injury coverage of the casualty and general liability policy issued by defendant The Franklin Mutual Insurance Company, Inc., (Franklin) to plaintiff Tradesoft Technologies, Inc. (Tradesoft). Franklin appeals from the entry of a partial summary judgment declaring its obligation to defend and indemnify Tradesoft in respect of an action brought against Tradesoft in the Federal District Court for the District of New Jersey by EBS Dealing Resources, Inc. and EBS Nominees Limited (collectively EBS) in which they alleged patent and trademark infringement as well as common law causes of action including misappropriation of trade secrets, breach of contract, tortious interference with contract, and unfair competition.
We note at the outset that the judgment appealed from is interlocutory in that it disposed only of Tradesoft's claims for defense and indemnity, reserving for future litigation the remaining five counts of Tradesoft's complaint whereby it alleged causes of action for breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, and bad faith denial of an insurance claim. It need hardly be said at this late date in the development of our appellate jurisprudence that a judgment is not final and hence is not eligible for an appeal as of right unless it disposes of all claims and issues as among all parties. See, e.g., CPC Intern. Inc. v. Hartford Acc. & Indemnity, 316 N.J.Super. 351, 365, 720 A.2d 408 (App.Div.1998), certif. denied, 158 N.J. 74, 726 A.2d 937 (1999); Stump v. Whibco, 314 N.J.Super. 560, 564-565, 715 A.2d 1006 (App.Div.1998); Scalza v. Shop Rite Supermarkets, 304 N.J.Super. 636, 638, 701 A.2d 764 (App.Div.1997).
We are well aware that R. 4:42-2 authorizes the trial court to certify an interlocutory order as final and that the trial court did so here on defendant's motion and over plaintiff's objection. But that authorization is expressly limited by the rule to an order that "would be subject to process to enforce a judgment pursuant to R. 4:59 if it were final and if the trial court certifies that there is no just reason for the delay of such enforcement...." Obviously, this interlocutory order is not subject to enforcement by way of execution and was, therefore, not eligible for certification. We have repeatedly held that piecemeal appeals are ordinarily contrary to the fair and expeditious conclusion of litigation; that the determination of whether the interests of the litigants and the judicial process otherwise requires can only be made by this court on a motion for leave to appeal properly brought pursuant to R. 2:5-6; and that the calendar of this court is not subject to the control of the trial court by way of an improvident finality certification. See, e.g., S.N. Golden Estates v. Continental Cas., 317 N.J.Super. 82, 87-88, 721 A.2d 307 (App.Div.1998); DeFelice v. Beall, 274 N.J.Super. 592, 595, n. 1, 644 A.2d 1136 (App.Div.), certif. denied, 138 N.J. 268, 649 A.2d 1288 (1994); Delbridge v. Jann Holding Company, 164 N.J.Super. 506, 509-510, 397 A.2d 356 *1081 (App.Div.1978). While we have the option, therefore, of simply dismissing this appeal as having been taken from an improvidently certified order, see, e.g., Hallowell v. American Honda Motor Co., Inc., 297 N.J.Super. 314, 318, 688 A.2d 110 (App.Div.1997), we have nevertheless elected to grant leave to appeal nunc pro tunc in the interest of substantial justice, particularly because of the inevitable effect of the order appealed from on the remaining claims.
We also point out, by way of preliminary observation, that we were advised shortly before oral argument that the federal action had been terminated by amicable agreement. Although plaintiff declined to inform either defendant or this court of the terms of the settlement, its attorney did advise us at oral argument that under the terms of the settlement, it was not obliged to make any monetary payment to the federal plaintiffs. Accordingly, it is clear, and plaintiff did not suggest to the contrary, that this is no longer a claim for defense or indemnity, but rather a claim for reimbursement of defense costs alone.
We begin by noting that while advertising injury coverage has apparently been considered in this state in only one reported case, FileNet Corp. v. Chubb, 324 N.J.Super. 476, 735 A.2d 1203 (Law Div.1997), aff'd o.b., 324 N.J.Super. 419, 735 A.2d 1170 (App.Div.1999), that coverage, employing substantially similar language from policy to policy, has received extensive consideration by the federal courts and some of our sister states, and that body of jurisprudence informs our determination of the issues that are novel in this jurisdiction.
It is, of course, well settled that the determination of whether a liability policy entitles the insured to a defense of an action brought against it requires first that the allegations of the complaint be compared with the policy language. "When the two correspond, the duty to defend arises, irrespective of the claim's actual merit." Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 173, 607 A.2d 1255 (1992). And if there is an ambiguity in the policy language, principles of insurance contract construction require the ambiguity to be resolved in the insured's favor. Id. at 175, 607 A.2d 1255.
We consider first the policy language. The advertising injury coverage is contained in Section 11 of Part IIB of the policy, entitled "Supplemental Coverages." To the extent applicable here, the supplemental coverage applies only to:
Advertising injury arising out of an offense committed in the course of advertising goods, products, or services of your business-operations covered here.

[Emphasis in the original.]
The policy further provides that:
Advertising injury means solely the following:
1. Infringement of copyright, slogan, or title.
2. Misappropriation of advertising ideas or style of doing business.
3. Oral or written publication of material that: slanders or libels a person or organization; disparages a person's or organization's goods, products, or services.
4. Oral or written publication of material that violates a person's right of privacy.

[Emphasis added.]
The coverage expressly excludes "[i]njury arising out of oral or written publication of material whose first publication took place prior to the beginning of this policy or such coverage under this policy." Another express exclusion not brought to the attention of the trial court but material here is for "[i]njury arising out of breach of contract, other than misappropriation of advertising ideas under an implied contract." Finally, also not brought to the attention of the trial court, the coverage provides that "[a] covered offense must take place within the policy term...."
*1082 The issue, of course, is whether the allegations of the federal complaint filed by EBS triggered Franklin's duty to defend Tradesoft under the advertising injury coverage of the policy. In general terms, these are the facts underlying the federal complaint. EBS developed and obtained a patent protecting a spot foreign exchange electronic brokering system and registered the trademark "EBS." The EBS system essentially allows the EBS subscribers, primarily banks, to anonymously broadcast offers to buy and sell currency at a specified price and amount against a different specified currency. John Bunch was EBS's Director of Product Development between February 1993 and November 1997. He is an expert in the foreign exchange trading market and the electronic application involved in the EBS system. Dan White, through his company Daniel White Consulting Inc., was an EBS consultant between 1993 and 1997, functioning as the senior designer in the EBS Technology Planning Department. In February 1997, while both were still working for EBS, Bunch and White incorporated Tradesoft and began to solicit brokerage houses as customers for their electronic foreign currency trading service apparently patterned on the EBS system. Their letters of solicitation referred to Tradesoft personnel as having been "key to the design, delivery and management of the EBS system."
Among the brokerage houses so solicited was Harlow, Meyer, Savage, LLC (Harlow), with whom negotiations ensued. Bunch and White then, sometime in the fall of 1997, severed their respective relationships with EBS, who, on November 17, 1997, notified both Bunch and White of their obligations to it in respect of the EBS proprietary information which they possessed. By April 1998, Tradesoft, in its written negotiations with Harlow, was referring to its electronic trading system as "ABS." A written agreement between Harlow and Tradesoft was executed in May 1998. The agreement included a provision whereby Tradesoft agreed to indemnify Harlow against any claim that the ABS software Tradesoft was providing Harlow under their agreement infringed upon a third party's intellectual property. Subsequent to the execution of the agreement, Tradesoft purchased the Franklin policy here in dispute. Its effective date was June 12, 1998. In July 1998 Tradesoft provided Harlow with its prototype electronic brokerage system, and at about that time created a website describing its ABS system.
EBS filed a nine-count complaint against Tradesoft, Bunch, White, and Daniel White Consulting in the federal court in November 1998. The first count alleges patent infringement. The second and third counts allege trademark infringement. The fourth count alleges common-law misappropriation of trade secrets and other proprietary information. The fifth and sixth counts allege breach of contract by Bunch and White respectively based on their appropriation of EBS intellectual property. The seventh count alleges tortious interference by Bunch and Tradesoft with EBS's contractual relationship with White by causing White to disclose to them EBS's confidential information. The eighth count alleges tortious interference by White and Tradesoft with EBS's contractual relationship with Bunch by causing Bunch to disclose to them EBS's confidential information. The ninth count charges all three, Tradesoft, Bunch and White, with unfair competition. The preceding factual allegations, in thirty numbered paragraphs, describe the conduct complained of with virtually no dates stated, alleging only that the EBS system was launched in 1993, that White was its consultant between 1993 and 1998, and that Bunch was its employee during the same period. The dates we have referred to above appear in the documents filed in this action.
Following the filing of the federal action, Franklin, after extensive investigation of the matter, declined to defend and indemnify. Tradesoft then filed this action, *1083 promptly moving for summary judgment before Franklin had an opportunity to commence discovery. The summary judgment was granted and, in our view, was granted improvidently. Franklin appealed and, as we have noted, during the pendency of the action, the federal action was settled in a manner obviating Tradesoft's indemnity claim.
Franklin's challenge to the summary judgment is essentially two-fold. It argues first that it has no coverage obligation at all because the activities of Tradesoft and its principals giving rise to the EBS complaint were pre-policy. The policy language on which it relies, above quoted, relieves it from obligation for "injury arising out of oral or written publication of material whose first publication took place prior to the beginning of this policy." It also argues, for various reasons and based on various theories, that except for the allegations of trademark infringement, none of the activities of Tradesoft and its principals alleged by EBS come within the advertising injury coverage as circumscribed by the policy's definitions. We find considerable merit in both arguments.
We address first the issue of pre-policy activity under the so-called first-publication exclusion, noting that resolution of this question requires factual determinations that cannot be made on the basis of the face of the federal complaint alone. Insofar as we understand this record there were two basic reasons, both of which we reject, for the judge's refusal to credit the pre-policy activity defense despite the undisputed fact that Tradesoft had marketed its competing system under the ABS name to Harlow prior to its obtaining of this insurance. The first is factual. Tradesoft argued, and the judge agreed, that the only activity referred to in the federal complaint giving rise to the alleged advertising injury suffered by EBS was Tradesoft's creation of its website, and since the website was created after it obtained the insurance, that cannot be said to have constituted a pre-policy activity. That premise, however, is simply not so. The reference to the website in the "Statement of Facts" portion of the complaint does not allege that the website was the beginning of the advertising injury. Rather, the allegations detail the entire course of the alleged offensive conduct of Tradesoft and its principals, including its pre-website soliciting activities, and then refer to the website as "describing" the competing ABS system. And although it is alleged that the "website markets the system under the trademark `ABS'," that it is not the first marketing referred to in the complaint, which refers specifically to the pre-policy marketing of the system to Harlow.
We also find untenable the court's conceptual basis for rejecting the first-publication defense. The court's reasoning was based on the text of the policy's four-part definition of advertising injury quoted above, namely, 1) copyright, trademark and tradename infringement, 2) misappropriation of advertising ideas or style of doing business, 3) oral or written publication of slander and libel, and 4) oral or written invasion of an individual's right to privacy. Only the definitions of defamation and invasion of the right to privacy define the advertising injury in terms of "oral or written publication" constituting such an offense. The infringement and misappropriation definitions do not. The verbiage of the pre-policy exclusion also uses the term "oral or written publication." The court thus concluded that the omission of the term "oral or written publication" from the infringement and misappropriation definitions created an ambiguity, namely, a feasible interpretation of the policy by which the pre-policy exclusion does not apply at all to infringement and misappropriation but only to defamation and invasion of privacy. Since the gravamen of the EBS complaint was only, if anything, infringement or misappropriation, the judge resolved that purported ambiguity in the insured's favor by concluding that there was no policy exclusion *1084 for pre-policy activity constituting infringement or misappropriation.
In so ruling, the judge relied on Irons Home Builders, Inc. v. Auto-Owners Ins. Co., 839 F.Supp. 1260, 1265 (E.D.Mich.1993), which had so reasoned in construing identical policy language. That rationale was, thereafter, rejected by Applied Bolting Technology Products, Inc. v. USF & G, 942 F.Supp. 1029, 1037 (E.D.Pa.1996), on these convincing grounds:
In my view, the first-publication exclusion must be read to apply to the entire definition of "advertising injury," which includes the offenses of "misappropriation of advertising ideas or style of doing business" and "infringement of copyright, title, or slogan." In the policy, the term "advertising injury" is always surrounded by quotation marks, and it appears with quotation marks in the first-publication exclusion. "Advertising injury" is defined by the four, not two, offenses expressly set forth in the policy to define "advertising injury." The first-publication exclusion bars coverage for "`advertising injury' ... [a]rising out of oral or written publication of material whose first publication took place before the beginning of the policy period." I read this exclusion to mean that "advertising injury," which I must assume the insurance company intentionally surrounded with quotation marks when it used that term in the exclusion, has the same four-subpart meaning when used in the exclusion that it has every other time it appears in the policy surrounded by quotation marks.
The exclusion must be read to give effect to the plain meaning of "advertising injury." When that is done, it is certainly irrelevant that some of the language in the exclusion happens to match some of the words in sub-parts (a) and (b) of the definition of "advertising injury" but not match some of the language in subparts (c) and (d). Accordingly, I find that the first-publication exclusion applies to all of the offenses listed in the four-subpart definition of "advertising injury," which would include any "advertising injury" alleged by Turner.
Finally, it seems evident that the first-publication exclusion was inserted in the policy to avoid precisely the situation presented in this case. In December, 1994, Applied began advertising that its DTIs satisfied ASTM F959-94a. Thereafter, on January 18, 1995, Applied obtained a CGL policy providing coverage for "advertising injury," and then continued its advertising campaign by republishing its claim "all DTIs made to ASTM F959-94a." Obviously, USF & G never intended to provide coverage for such republications during the policy period.
We find the reasoning of Applied Bolting completely persuasive. In our view, application of the first-publication exception to defamation and invasion of privacy alone not only constitutes a tortured reading of the coverage, but is, as well, contrary to the legal concepts involved. That is to say, it is obvious that there can be no defamation without publicationpublication is at the heart of that tort and, indeed, defines it. The same is true of invasion of privacy. On the other hand, we think it clear that an infringement or misappropriation cause does not require publication as an element and hence there is no need to so define those offenses. Our point is that the use of the term "publication" in respect of defamation and invasion of privacy defines the offense and not the injury. The publication element of the injury is obviously common to all four categories of advertising injury, and the first-publication exclusion is, therefore, also common to all. In any event, we fully endorse Applied Bolting and hold that the first-publication exception applies to infringement and misappropriation.
Since all of Tradesoft's coverage claims are comprehended by the infringement and misappropriation definitions, if covered at all, it is essential to fix the time vis-a-vis the date of issuance of the policy *1085 when the first offending publications took place. From the facts of record on this motion, it appears that Tradesoft's solicitation of brokers, its negotiation and ensuing agreement with Harlow and the representations made respecting the experience and expertise of its principals, all predated the policy and that the website, created and appearing on the Internet thereafter, was a republication. On the other hand, it also appears that Tradesoft has refused to disclose certain relevant documents to Franklin, apparently on the ground of trade secret, that might assist in the date-fixing determination. And, as we have said, there was no full opportunity for discovery. As we view the matter, based on this record the onus is now on Tradesoft, as respondent to Franklin's summary judgment motion, to adduce facts contradicting or at least raising a factual dispute with respect to the first-publication date of its alleged infringement and misappropriation, and both parties are certainly entitled to discovery on that issue, subject, if necessary, to a protective order pursuant to R. 4:10-3 in respect of Tradesoft's alleged trade secrets or other confidential information. We remand for that purpose. If Franklin can demonstrate the offending publications first took place prior to the effective date of the policy, it will be entitled to the grant of its motion for summary judgment.
Although the first-publication issue may be completely dispositive, we are nevertheless constrained to comment briefly on several of Franklin's arguments that were rejected by the trial court.
First is the issue of whether a patent infringement may constitute an advertising injury as defined by the policy. The question arises because of the amendment of 35 U.S.C.A. § 271(a), effective January 1, 1996, which expressly included an offer to sell as a patent infringement. Prior to that amendment, the courts were virtually unanimous in concluding that a patent infringement was not a covered advertising injury under the "copyright, slogan or title" or similar formulations. See Novell Inc. v. Federal Ins. Co., 141 F.3d 983 (10th Cir.1998); Microtec Research, Inc. v. Nationwide Mutual Ins. Co., 40 F.3d 968 (9th Cir.1994); Intex Plastics Sales Co. v. United National Ins. Co., 23 F.3d 254 (9th Cir.1994); Everest & Jennings, Inc. v. American Motorists Ins. Co., 23 F.3d 226 (9th Cir.1994); Iolab Corp. v. Seaboard Surety Co., 15 F.3d 1500 (9th Cir.1994); United States Fidelity and Guaranty Co. v. Star Technologies, Inc., 935 F.Supp. 1110 (D. Oregon 1996); Heil Co. v. The Hartford Accident and Indemnity Co., 937 F.Supp. 1355 (E.D.Wisc.1996); I.C.D. Industries, Inc. v. Federal Ins. Co., 879 F.Supp. 480 (E.D.Pa.1995); Atlantic Mutual Ins. Co. v. Brotech Corp., 857 F.Supp. 423 (E.D.Pa.1994); National Union Fire Ins. Co. of Pittsburgh v. Siliconix, Inc., 729 F.Supp. 77 (N.D.Cal.1989); Bank of the West v. Superior Court, 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992); Julian v. Liberty Mutual Ins. Co., 43 Conn.App. 281, 682 A.2d 611 (1996).
That conventional wisdom changed with the 1996 patent law amendment. As explained by Maxconn, Inc. v. Truck Ins. Exchange, 74 Cal.App. 4th 1267, 88 Cal.Rptr.2d 750, 754 (1999), prior to the amendment, a patent infringement required the manufacture, use or sale of the patented invention. An offer to sell a patented device was not regarded as an infringement. The effect of the amendment, therefore, was to render a patent infringement based on an offer to sell a coverable advertising injury. The question then is whether it is in fact an advertising injury covered under the terms of this policy.
To begin with, the courts agree that an "offer to sell" patent infringement is not covered by the copyright/trademark infringement definition for the simple reason that that definition is clear, unambiguous and exclusive and cannot, therefore, be reasonably stretched or manipulated to include patent infringement. The debate, rather, is whether such patent infringement comes within the misappropriation *1086 definition, that is, "misappropriation of advertising ideas or style of doing business." At least one court has held that the misappropriation definition is sufficiently ambiguous to encompass "offer to sell" patent infringement, see Everett Associates v. Transcontinental Ins. Co., 57 F.Supp.2d 874 (N.D.Cal.1999). This jurisdiction has, however, in FileNet Corp., supra, 324 N.J.Super. at 476, 735 A.2d 1203, already joined those courts that have expressly rejected this notion. See, e.g., Applied Bolting, supra, 942 F.Supp. at 1029; Owens-Brockway Glass Container, Inc. v. International Ins. Co., 884 F.Supp. 363 (E.D.Cal.1995); St. Paul Fire & Marine Ins. Co. v. Advanced Interventional Systems, 824 F.Supp. 583 (E.D.Va.1993); Mez Industries, Inc. v. Pacific National Ins. Co., 76 Cal.App.4th 856, 90 Cal.Rptr.2d 721 (1999). While we recognize that some of these cases were decided prior to the 1996 amendment of the patent law, we are nevertheless persuaded that their rationale is unaffected thereby. We agree that patent infringement, whether by offer to sell or otherwise, is simply not within the commonly understood meaning of "advertising ideas" or "style of doing business." Moreover, as the Law Division noted in FileNet, supra, 324 N.J.Super. at 499-500, 735 A.2d 1203, the effect of including patent infringement within the misappropriation definition "would be to find that the parties went to considerable trouble to list numerous common law torts and numerous other specifically defined offenses but also intended to provide coverage for a separate and distinct class of claims, namely patent infringement, without so much as a passing reference to the concept or the theory." Thus, as FileNet concluded, id. at 500, 735 A.2d 1203, quoting St. Paul Fire & Marine Ins. Co., supra, 824 F.Supp. at 586:
it is nonsense to suppose that if the parties had intended the insurance policy in question to cover patent infringement claims, the policy would explicitly cover infringements of "copyright, title or slogan", but then include patent infringement, sub silentio, in a different provision, by reference to "unauthorized taking of ... [the] style of doing business."
We continue to adhere to that view and conclude, therefore, that an "offer to sell" patent infringement is not encompassed by the advertising injury coverage of this policy.[1]
We address briefly the six common-law tort counts of the federal action against Tradesoft. Although not raised by the parties, we think it plain that the two breach of contract counts are excluded from coverage by the specific exclusion of "injury arising out of breach of contract, other than misappropriation of advertising ideas under an implied contract." The facts underlying the breach of contract counts allege express contracts between EBS and Bunch and EBS and White that included confidentiality agreements respecting EBS's intellectual property. Thus, we are satisfied that these two counts of the EBS complaint do not match Franklin's coverage obligations as set forth in the policy.
That brings us to the remaining common law counts: common law misappropriation of trade secrets and other proprietary information, tortious interference with contractual relationships and common-law unfair competition. The question, of course, is whether these torts are within the coverage. That question brings us back to the basic policy meaning of an advertising injury. The policy defines it as an injury "arising out of an offense committed in the course of advertising goods, products or services...." But not every injury is coveredthe only covered injuries are copyright, slogan or title infringement, misappropriation of advertising *1087 ideas or style of doing business, defamation and invasion of privacy. And, moreover, the injury must result from an offense committed in the course of advertising. Said another way, in order for there to be coverage there must be a causal connection between the advertising and the injury and the injury must fall within one of the four categories defined by the policy. See Frog Switch & Manufacturing Co., Inc. v. Travelers Ins. Co., 193 F.3d 742, 751 n. 8 (3d Cir.1999). Thus, we think it plain that the import of the advertising injury coverage was to afford protection to the insured for offenses committed while undertaking advertising activities that caused specifically defined injuries. It was not reasonably intended by either party to this insurance contract nor reasonably understood by them to offer liability coverage for the entire gamut of business torts simply because after commission of the basic tortious conduct there was a sale or offer to sell. As expressed by the Ninth Circuit in Simply Fresh Fruit, Inc. v. Continental Ins. Co., 94 F.3d 1219, 1223 (9th Cir.1996), in order to invoke the coverage of the policy, "the advertising activities must cause the injurynot merely expose it." [Emphasis added.]
As we see it then, the tortious interference claims alleged by EBS do not allege an advertising injury within the intendment of the policythey allege rather an offense whose gravamen is distinctly different from, and which was committed long before, any advertising activity, and hence long before the policy term began. That is to say, the eventual advertising exposed the injury sustained by EBS as a result of the alleged tortious interference with contractual relationships. The advertising activity itself did not cause the injury.
With respect to EBS's claim of misappropriation of trade secrets, we note first that the federal courts have distinguished between trade secrets related to manufacturing and production and those related to marketing and sales, holding that the appropriation of manufacturing and production trade secrets does not meet the required causal nexus since the injury is the misappropriation and not the advertising by which the misappropriation was revealed. See Frog Switch, supra, 193 F.3d at 751, n. 8; Simply Fresh Fruit, supra, 94 F.3d at 1223. Misappropriation of trade secrets relating to marketing and sales has, however, been held to constitute an advertising injury within the misappropriation definition since it constitutes a misappropriation of advertising ideas within the evident intendment of the policy. See Sentex Systems, Inc. v. Hartford Acc. & Indem. Co., 93 F.3d 578, 580 (9th Cir.1996). The misappropriation alleged by EBS was of "confidential information concerning the computer code, proposed modifications ..., confidential business plans, customer surveys and marketing studies relating to the EBS dealing system, including in-depth analysis of liquidity development, deployment and sale of the system." While the subject of the misappropriation thus alleged is not merely sales and marketing, we are satisfied that its sales and marketing components are sufficiently substantial to invoke the coverage provided the first-publication exclusion does not otherwise bar the coverage and provided further that the offense was committed after the effective date of the policy.
The final count of the EBS complaint alleges unfair competition in broad terms, claiming only that the actions of Tradesoft and its principals were so "especially egregious and malicious" as to constitute "wilful and deliberate unfair competition...." We are satisfied that by these allegations, the EBS complaint did nothing more than encompass all of the other allegations of the complaint as a basis for seeking punitive damages. No advertising injuries, other than those previously alleged and with which we have already dealt, are alleged, and hence no new or separate coverage duty was thereby triggered.
*1088 To summarize, we are satisfied that although the first-publication exclusion appears to apply here to preclude coverage, questions of fact have been raised which require further exploration by way of discovery and determination by way of findings of fact. If the decision favors Tradesoft, we are further satisfied that the only covered counts are copyright/trademark infringement and misappropriation of trade secrets. Should these claims ultimately be deemed to be covered, then, in fixing Tradesoft's damages for deprivation of a defense to the federal action, an apportionment must be made as to covered and uncovered claims. See, e.g., SL Industries v. American Motorists, 128 N.J. 188, 607 A.2d 1266 (1992); Voorhees, supra, 128 N.J. 165, 607 A.2d 1255.
Several issues remain. First, we reject Franklin's claim that an apportionment must be made as between the defense of claims for damages and claims for injunctive relief. Since each count of the complaint demanded both, we are of the view that an apportionment of this nature would, under the circumstances, be impractical, illogical and unfair. Second, while we agree with Franklin that Daniel White Consulting, Inc. as a separate entity is not entitled to coverage under the policy, it is plain that Dan White himself is. He is a principal of Tradesoft and was sued by EBS in that capacity. Finally, we reject Franklin's reliance on the so-called known-risk doctrine in order to avoid coverage substantially for the reasons stated by the trial judge. See CPC International, supra, 316 N.J.Super. at 378, 720 A.2d 408.
The summary judgment appealed from is reversed and we remand for further proceedings consistent with this opinion.
NOTES
[1] As to the trademark infringement counts, these are obviously covered by the policy, and Franklin does not argue to the contrary.