

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-6-2004

# Houbigant Inc v. Fed Ins Co

Precedential or Non-Precedential: Precedential

Docket No. 03-1286

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Houbigant Inc v. Fed Ins Co" (2004). *2004 Decisions.* Paper 445.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/445

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

No: 03-1286

HOUBIGANT, INC.;
ESTABLISSEMENT HOUBIGANT,

Appellants

v.

FEDERAL INSURANCE COMPANY;
FIREMAN'S FUND INSURANCE
COMPANIES

Appeal from the United
States District Court
for the District of New Jersey
(Civil Action No. 01-cv-05993)
District Judge: Hon. Mary L. Cooper

Argued: November 7, 2003

Before: McKEE, SMITH, and
GREENBERG, Circuit Judges.

(Opinion Filed July 6, 2004)

JOHN W. SCHRYBER (argued)
Patton and Boggs
2550 M Street, N.W.
Washington, D.C. 20037

ROBERT D. CHESLER
Lowenstein Sandler
65 Livingston Avenue
Roseland, N.J. 07068
Attorneys for Appellants

GERARD H. HANSON
MARILYN S. SILVIA
(argued)
Hill Wallack
202 Carnegie Center
Princeton, N.J. 08543
Attorney for Federal Insurance
Company, Appellee

ALFRED C. CONSTANTS, III
Caron, Constants & Wilson
201 Route 17 North
Rutherford, N.J. 07070
Attorney for Fireman's Fund Insurance
Companies, Appellee

OPINION OF THE COURT

McKEE, Circuit Judge.

Houbigant, Inc. and Establissment Houbigant (collectively, "Houbigant") appeal the district court's order granting Federal Insurance Company's ("Federal") motion for summary judgment and denying Houbigant's cross motion for summary judgment.[1] For the reasons discussed below, we will reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

---

[1] Houbigant also appealed the district court's grant of summary judgment in favor of Fireman's Fund Insurance Companies, an excess insurer. However, the parties have indicated that the dispute between Houbigant and Fireman's Fund has been settled. Thus, that appeal is moot.

## I. BACKGROUND

Houbigant has been in the business of creating and manufacturing fragrances for more than 200 years. Between 1994 and 1996 Houbigant entered into a series of licensing agreements with Dana Perfumes Corporation and Houbigant (1995) Ltee. Ltd. ("Insureds"). R. at 734; *see also* R. at 815-57. Under the agreement, the Insureds were granted a license to manufacture and sell certain Houbigant fragrances and use the trademarks associated with them. R. at 818-19. However, the Insureds were required to manufacture, package, and label Houbigant products in accordance with particular specifications in order to ensure authenticity and quality. R. at 824.

The Insureds eventually filed for Chapter 11 bankruptcy. Shortly thereafter, Houbigant filed a bankruptcy claim against the Insureds alleging that they had directly or contributorily infringed Houbigant's "trademarked titles" and breached Houbigant's contractual obligations by: (1) selling a "watered-down" version of Houbigant's "Chantilly" fragrance; (2) selling the "know-how" and physical components required to make Chantilly and three other fragrances to unlicensed fragrance producers who sold the products worldwide;[2] (3) using the Houbigant name to sell non-Houbigant products; and (4)

indicating that the Chantilly fragrance was produced by the Insureds. R. at 728-48. Houbigant claimed tort damages in excess of $99 million[3] and a separate claim for contractual damages in excess of $105 million resulting from the Insured's conduct. R. at 744-54. The Insureds notified their insurer, Federal, of the pending claim.

At that time, the Insureds were covered by two policies issued by Federal: (1) the Commercial General Liability policy ("CGL policy"); and (2) the Commercial Excess Umbrella policy ("Umbrella policy"). The CGL policy provides coverage for "advertising injury," R. at 499, which is defined, in relevant part, as "injury . . . arising solely out of . . . infringement of trademarked or service marked titles or slogans," where such infringement is "committed in the course of advertising of [the insured's] goods, products or services . . . ." R. at 512. However, the policy excludes coverage of any advertising injury "arising out of breach of contract," R. at 505, or "an infringement, violation or defense of any . . . trademark or service mark or certification mark or collective mark or trade name, other than trademarked or service marked titles or slogans." R. at 507.

---

[2] The other fragrances involved were "Lutece," "Rafinee," and "Demi-Jour." R. at 739.

[3] Houbigant also sought treble damages, attorneys fees, and prejudgment interest under §1117(b). In total, Houbigant alleged that the Insureds tort liability was in excess of $320 million.

The Umbrella policy contains two separate coverage provisions. Coverage A, entitled "Excess Follow Form Liability Insurance," covers "that part of the loss . . . in excess of the total applicable limits of [the] underlying insurance [policy] . . ." under the same terms as said policy. R. at 278. Coverage B of the Umbrella policy, entitled "Umbrella Liability Insurance," covers "damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of . . . advertising injury . . . ." R. at 279. This includes injury "arising solely out of . . . infringement of copyrighted titles, slogans or other advertising materials," where such infringement is "committed in the course of advertising . . . ." R. at 288-89. Coverage B also excludes breach of contract claims. R. at 285.

Federal denied coverage under both policies. Nonetheless, Houbigant and the Insureds agreed to settle the tort claims for an unsecured $50 million. Under the terms of the agreement, Houbigant obtained the right to "prosecute any cause of action against [Federal], at Houbigant's sole expense, arising from any failure by [Federal] to indemnify the [Insureds] liability to Houbigant with respect to [the tort claims]." R. at 760. The parties also agreed that Houbigant's recovery would be limited to indemnification under the implicated Federal insurance policies. The bankruptcy court approved the settlement, finding that it was "fair, reasonable, . . . and entered into following good faith, arms length negotiations . . . ." R. at 813.

Houbigant subsequently initiated this diversity action against Federal seeking indemnification under the implicated policies pursuant to the assignment it received as part of the settlement with the Insureds. The court ruled that there was no coverage under either policy, and that Federal was not bound by the settlement approved by the bankruptcy court. This appeal followed.[4]

## II. A.  Policy Coverage

Although we find that both policies cover the conduct of the Insureds, the story takes some telling. Thus, we will address each policy in turn.

### 1.  CGL Policy

#### a.  Trademarked Titles

As stated above, Houbigant alleged that the Insureds:  (1) sold a "watered-down" version of Houbigant's "Chantilly" fragrance; (2) sold the "know-how" and physical components required to make Chantilly and three other fragrances to unlicensed fragrance producers who sold the products worldwide; (3) used the Houbigant name to sell non-Houbigant products; and (4) indicated that the Chantilly fragrance

---

[4] We have jurisdiction to consider this appeal under 28 U.S.C. § 1291.  We review the district court's grant of summary judgment *de novo,* applying the same standard as the district court. *Penn. Coal Ass'n.  v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

was produced by the Insureds. R. at 728-48. There is no question that these allegations, if true, constitute trademark infringement in violation 15 U.S.C. § 1125(a)(1)[5] and that Houbigant would be entitled to damages pursuant to § 1117.

However, the CGL policy "does not apply to . . . advertising injury . . . arising out of . . . infringement, violation or defense of any . . . trademark or service mark or certification mark or

collective mark or trade name, *other than trademarked or service marked titles or slogans.*" R. at 507 (emphasis added). Based on the wording of this exclusion, it is clear that a trademarked title is regarded as a subset or type of trademark. However, the policy does not offer any further explanation or definition of the term. Thus, we must first determine whether Houbigant's marks constitute "trademarked titles."

The insurance contracts in question were entered into in New Jersey, and we are thus bound by the controlling law of that state.[6] However, the New Jersey Supreme Court has yet to define the term "trademarked title." Therefore, "we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Packard v. Provident Nat. Bank*, 994 F.2d 1039, 1046 (3d

---

[5] Section 1125(a)(1) provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

---

[6] We must apply the forum state's choice of law rule. *General Star Nat. Ins. Co. v. Liberty Mut. Ins. Co.*, 960 F.2d 377, 379 (3d Cir. 1992) (citation omitted). With respect to insurance disputes such as this, the New Jersey Supreme Court has held that "the law of the place of the contract will govern the determination of the rights and liabilities of the parties under the insurance policy." *State Farm Mut. Auto. Ins. Co. v. Simmons' Estate*, 84 N.J. 28, 37 (1980).

Cir.1993).

We begin our analysis with *Villa Enters. Mgmt., Ltd. v. Fed. Ins. Co.*, 821 A.2d 1174 (N.J. Super. Ct. Law Div. 2002), a New Jersey trial court decision that addresses the very issue before us.[7] In fact, not only does *Villa* address the same issue, it actually involves the same insurer, Federal. In *Villa*, Federal refused to defend or indemnify the insured against damages stemming from an alleged advertising injury arising out of the insured's use of the term "VILLA PIZZA," a trademark and service mark owned by another company.

The court in *Villa* began its analysis with a review of the law governing interpretation of insurance policies in New Jersey. *See id.* at 1182-83. The court found two principles particularly helpful. First, "the words of an insurance policy should be given their ordinary meaning." *Id.* at 1182 (quoting *Longobardi v. Chubb Ins. Co. of New Jersey*, 582 A.2d 1257, 1260 (N.J. Sup. Ct. 2002) (internal quotation marks omitted)). Second, "any ambiguity must be resolved in the insured's favor." *Id.*

---

[7] It is important to note that the *Villa* decision, although decided prior to the district court's decision in this case, was not published until several months after the district court ruled on the parties' cross motions for summary judgment. Thus, the district court did not have the benefit of the reasoning in *Villa* when it adjudicated this dispute.

(citing *Voorhees v. Preferred Mut. Ins. Co.*, 607 A.2d 1255, 1259 (N.J. Sup. Ct. 1992)). The *Villa* court then considered the term, "trademarked title." Inasmuch as that New Jersey court's analysis is so germane to our inquiry, we will quote its analysis at length:

> In this policy, coverage is not extended for titles and slogans generally but only for trademarked and service-marked titles and slogans. The ordinary insurance consumer faced with Federal's language of coverage and exclusion would not begin with the assumption that 'trademarks, service marks, certification marks, collective marks and trade names' are a subset of 'trademarked or service-marked titles or slogans,' but rather would begin with the converse assumption. The question thus becomes: How are trademarked or service-marked *titles* or *slogans* different from all other trademarks and service marks?
>
> Trademarks and service marks are devices used in connection with the sale or advertisement of products

or services of particular merchants to distinguish them from similar products or services of others and identify the source of the trademarked products or service-marked services. The Lanham Act states that the term 'trademark' includes 'any word, name, symbol, or device, or any combination thereof, adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others.' 3 *Callmann on Unfair Competition, Trademarks and Monopolies,* § 17:1 (Louis Altman ed., 4th ed. 2002). According to *Callmann,* an even broader definition was proposed for Article 6 of the Paris Convention and that was 'any mark or medium that can be conceived by the senses, that is capable of distinguishing merchandise, products or services of a ... person from those of another.'

Although trademarks and service marks certainly may be trademarked or service-marked titles (Corel ® WordPerfect ®) or slogans (Ponds' 'The Skin You Love to Feel'), they may also be symbols or emblems (McDonalds' golden arches *M* ®). Indeed, a color configuration is a 'device' for the purposes of the Lanham Act definition. *Shakespeare Co. v. Silstar Corp. of America Inc*., 802 F.Supp. 1386 (D.S.C. 1992), *rev'd on other grounds*, 9 F.3d 1091 (4th Cir. 1993). Purely audible marks may be registered, 3 *Callmann, supra,* at n. 4, and so too may a fragrance be registered as a mark. *See In re Clark*, 17 U.S.P.Q.2d 1238 (TTAB 1990).

Viewed in this fashion, no tortured examination of various definitions of 'title' need be made. Under the Federal policy before us, advertising injuries arising from a claim of infringement of a trademarked or service-marked title (i.e., *any* trademarked or service-marked *name*) is entitled to defense and indemnification whereas advertising injuries arising

from a claim of infringement of other trademarked or service-marked words, symbols or devices are not covered, nor claims of infringement based on certification marks, collective marks and unregistered trade names. This analysis is consistent with the plain meaning of the clauses in ordinary language using the broadest definition of 'title' recognized by all cited authorities, legal and linguistic, and follows the mandate of *Longobardi* to give insurance policy language its plain meaning.

*Id.* at 1185-87 (footnotes omitted). Ultimately, the *Villa* court found that a reasonable insured would believe the term "title" includes "any name, . . . appellation, . . . epithet, [or] . . . word by which a product or service is known." *Id.* at 1187.

However, Federal argues that the California Supreme Court's decision in *Palmer v. Truck Ins. Exchange*, 988 P.2d 568 (Cal. 1999) offers a more persuasive basis for distinguishing trademarked titles from other types of trademarks. The applicable California insurance law is essentially the same as the relevant

New Jersey law.[8] Nevertheless, the *Palmer* court came to a different conclusion than the *Villa* court. The *Palmer* court first noted that the "definition of 'title' cannot subsume the definition[] of trademark . . . . Otherwise, all or part of the exclusion clause becomes meaningless." *Id.* at 574. The court concluded that "defining 'title' to mean 'any name' would abrogate the policy language excluding coverage for trade name infringement because trade names . . . are the subset of names used by a person to identify his or her business or vocation." *Id.* (citation and internal quotation marks omitted). In order to avoid this result, the *Palmer* court limited the meaning of "title" to "the name of a literary or artistic work." *Id.*

We are not required to follow *Villa*, *see C.I.R. v. Bosch's Estate*, 387 U.S. 456, 465 (1967),[9] and we are

_____

[8] Under California law: (1) "[the court] must give [policy] terms their ordinary and popular sense"; and (2) "ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) . . . ." *Palmer*, 988 P.2d at 572-73 (internal citations and quotations marks omitted).

[9] In *C.I.R.*, the Supreme Court held that the ruling of a "lower state court[]" is "not controlling . . . where the highest court of the State has not spoken on the point." 387 U.S. at 465 (citation and internal quotation marks omitted).

certainly not bound by *Palmer*. However, the court's reasoning in *Villa* persuades us that the New Jersey Supreme Court would agree with that trial court's analysis if faced with this issue. As an initial matter, there can be no dispute that "title" has several meanings, including: (1) "[a]n identifying name given to a book, play, film, musical composition or work of art"; (2) "[a] general or descriptive heading, as of a book chapter . . ."; and (3) "[a] descriptive appellation: EPITHET . . . ." *Villa,* 821 A.2d at 1181 (quoting *Webster's II New College Dictionary* at 1157). Under New Jersey law, "[w]here the policy language supports two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied." *Id.* at 181 (quoting *Lundy v. Aetna Casualty*, 458 A.2d 106,

---

However, "an intermediate appellate state court [decision] . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (citation and internal quotation marks omitted). Because *Villa* is only a trial court decision, it is not necessarily entitled to such deference. Nonetheless, we consider the *Villa* decision to the extent that the quality of its analysis convinces us that the New Jersey Supreme Court would decide the issue similarly. *Packard*, 994 F.2d at 1046.

111 (N.J. 1983) (internal quotation marks omitted)). Thus, the only basis for *Palmer*'s more narrow interpretation of trademarked title was its concern that defining "title" broadly to include any name would conflict with the policy's exclusion of coverage of advertising injury arising out of trade name infringement. However, this concern ignores the statutory distinction between "trademarks" and "trade names." The Lanham Act defines a "trademark," in relevant part, as "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish *his or her goods* . . . from those manufactured or sold by others and to indicate the source of the goods . . . ." 15 U.S.C. §1127 (emphasis added). In contrast, "trade name" is defined as "any name used by a person to identify his or her *business or vocation*." *Id.* (emphasis added). Thus, the statutory definition of trademark limits the scope of the term trademarked title and distinguishes it from trade names.

Another more fundamental problem with the analysis in *Palmer* is that it ignores the purpose of a commercial insurance policy. As the *Villa* court points out, "[w]ho, reading the policy at issue, would think for a second that it would cover infringement of *Catcher in the Rye* Bread ® but not Wonder Bread ®?" 821 A.2d at 1187. An insured would not reasonably assume that a commercial insurance policy only covers literary or artistic titles and not ordinary product titles. Moreover,

limiting trademarked titles to literary or artistic works would "*create* an ambiguity rather than resolve one . . . ." *id.* Not only would it "send insureds on a quixotic quest for literary works the title of which coincidently mirrored the registered title alleged to have been infringed," *Id.*, it would create endless litigation over what constitutes literary or artistic work. As Justice Blackmun has so aptly noted, "[r]easonable people certainly may differ as to what constitutes literary or artistic merit." *Pope v. Illinois*, 481 U.S. 497, 506 (1987) (Blackmun, J., concurring in part and dissenting in part).

Thus, we accept the more straightforward definition of "title" set forth in *Villa*, and define trademarked title as any name, appellation, epithet, or word used to identify and distinguish the trademark holder's goods from those manufactured or sold by others. Houbigant's house mark and product mark (*e.g.*, "Chantilly") falls within this definition. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 619 n.7 ("The term 'house mark' refers to a company name or line of products, while the term 'product mark' refers to the name of a particular product. Thus, 'Ford' is a house mark and 'Mustang' is a product mark.") (citing *McCarthy on Trademarks and Unfair Competition* § 7:5 (4th ed.)).[10]

---

[10] Federal also relies on the decision in *Hugo Boss* in support of its definition of trademarked title. However, *Hugo*

### b. Advertising Injury

In order for the advertising injury provision of the CGL policy to apply, the conduct in question must have been "committed in the course of adverting of [the insured's] goods, products or services." R. at 512. In *Tradesoft Technologies, Inc. v. Franklin Mut. Ins. Co., Inc.*, 746 A.2d 1078 (N.J. Super. Ct. App. Div. 2000), the court also addressed the same policy language at issue here. There, the insured was sued for patent and trademark infringement as well as several common law causes of action. *Id.* at 140.[11] The court held that "in order for there to be coverage [under the policy] there must be a causal connection between the advertising and the injury . . . ." *Id.* at 152 (citing *Frog, Switch & Mfg. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.8 (3d Cir. 1999)). In other words, "the *advertising activities* must *cause* the injury–not merely expose it." *Id.* at 152 (citation and internal quotation marks omitted). The court held that the patent infringement claim, which simply consisted of an alleged offer to sell the patented product, was not covered by the advertising injury provision of the policy

---

*Boss* involved "trademarked slogans," and offers no insight into the meaning of trademarked title.

[11] The additional causes of action were misappropriation of trade secrets, breach of contract, tortious interference with a contractual relationship, and unfair competition.

because such conduct was "not within the commonly understood meaning of 'advertising ideas' or 'style of doing business.'" *Id.* at 150. On the other hand, the court noted that the trademark infringement claim was "*obviously covered by the policy . . . .*" *Id.* 151 n.1 (emphasis added).

As stated above, *Tradesoft* relied, in part, on our opinion in *Frog, Switch*. There, a competitor of the insured filed a complaint alleging that the insured entered the particular product market by using the competitor's proprietary trade secrets, confidential business information, and technology misappropriated by a former employee. *Frog, Switch*, 193 F.3d at 745. The competitor also alleged that the insured "falsely represented that it had developed a new and 'revolutionary' design for [the product], and falsely depicted [the product] with [its own] logo." However, "[t]he parts and components sold in commerce by [the insured] as its own were really [the competitors's] products made by use of stolen drawings . . . ." *Id.* In considering whether this was an advertising injury, we observed: "to be covered by the policy, allegations of unfair competition or misappropriation have to involve an *advertising* idea, not just a nonadvertising idea that is made the subject of advertising." *Id.* at 748. We then considered several district court cases where a "passing off" claim was held to have caused an advertising injury. *See id.* at 749 (citations omitted). We noted that each of those cases "involved

allegations that an insured was trading on the recognizable name, mark, or products configuration (trade dress) of the underlying plaintiff." *Id.*

In contrast, the underlying plaintiff in *Frog, Switch* simply alleged that the insured "took the [product] design and lied about the design's origin." *Id.* We therefore held that the advertising injury provision of the policy was not implicated by the complaint. As we later noted in *Green Mach. Corp. v. Zurich-American Ins.*, 313 F.3d 837, 840 (3d Cir. 2002), "[a]dvertising injury is not . . . the same thing as advertising *per se*. Rather, "[a]dvertising injury is the misappropriation of another's advertising idea or concept." *Id.* Similarly, in *Green Machine*, a competitor filed a complaint against the insured, alleging infringement of a patented method of cutting concrete. The only connection to advertising was an allegation that the insured advertised the method to others. *See id*. In other word, the only advertising idea in question was the very idea to advertise, nothing more. As in *Tradesoft*, this was insufficient to implicate the advertising injury provision of the policy. *See id.*

Thus, in order to invoke the advertising injury provision, the injury in question must have been caused by the advertising activity itself. The insured must have misappropriated an advertising idea, not just an idea that later became the subject of an advertising campaign. Here, the injury in question was the result of alleged trademark infringement. In *Frog, Switch*, we

discussed the close relationship between trademarks and advertising: "[a] trademark can be seen as an 'advertising idea' [because] [i]t is a way of marking goods so that they will be identified with a particular source." *Id.* (citing *Northam Warren Corp. v. Universal Cosmetic, Co.*, 18 F.2d 774, 774 (7th Cir. 1927) ("[a] trademark is but a species of advertising, its purpose is to fix the identity of the article and the name of the producer in the minds of the people who see the advertisement . . . .")). Trademarks, therefore, have the same purpose as advertising.

Federal cites several cases from other circuits that it argues more narrowly proscribe the scope of "advertising." However, we are not persuaded. For example, Federal cites *EKCO Group, Inc. v. Travelers Indem. Co. of Ill.*, 273 F.3d 409 (1st Cir. 2001). There, the Court of Appeals for the First Circuit found that "a real teapot intended for sale as a kitchen utensil" was not an advertising idea. *Id.* at 413. The court held that there was a "distinction between producing and selling the goods on the one hand and 'advertising' them on the other . . . ." *Id.* at 414. The same distinction exists here. That is to say, there is a distinction between the Houbigant's trademarks (*i.e.*, the advertising), and the production and sale of its perfumes (*i.e.*, the goods). In fact, without the use of Houbigant's marks, there would be no claim against the Insureds in the first instance. Therefore, *EKCO* is clearly distinguishable from the

matter at hand.

Federal also cites *Advance Watch Co., Ltd. v. Kemper Nat. Ins. Co.*, 99 F.3d 795 (6th Cir. 1996). In *Advance Watch*, a competitor of the insured filed a complaint alleging, *inter alia*, that writing instruments sold by the insured diluted the distinctiveness of the competitor's mark and thereby infringed the competitor's trademark. In finding no coverage under the policy, the Court of Appeals for the Sixth Circuit reasoned:

> In the present action, we conclude that the reasonable expectation of these parties as to coverage rests on the fact that 'misappropriation of advertising ideas or style of doing business' refers to a grouping of actionable conduct fairly well delimited by case law, and does not refer to another, distinct grouping of actionable conduct which has come to be commonly referred to in case law and in legal treatises as 'trademark and trade dress infringement.'

*Id.* at 804. Thus, *Advance Watch* is at odds with *Tradesoft* as well as our decision in *Frog, Switch*, both of which hold that trademark infringement is an advertising injury. However, *Advance*

-11-

*Watch* has been "sharply criticized for ignoring the real contours of intellectual property litigation . . . ." *Frog, Switch*, 193 F.3d at 747. Therefore, we are not persuaded by the reasoning in *Advance Watch*. Instead, we hold that the injury caused by the Insureds' infringement of Houbigant's trademarks is an advertising injury.[12]

### c. Contract Exclusion

Federal's CGL policy expressly excludes coverage for "advertising injury *arising out of* breach of contract." R. at 505 (emphasis added). Although their bankruptcy claim against the Insureds contains both breach of contract and tort allegations, R. at 728-48, Houbigant only seeks to enforce the underlying insurance policy insofar as it relates to the latter. We must therefore determine if the alleged torts are excluded from coverage by the "arising out of" contract exclusion.

At least one state court has construed such language broadly to include injury "originating from," "having its origins in," "growing out of," or "flowing from" the contractual relationship. *Callas Enters., Inc. v. Travelers Indem. Co. of Am.*, 193 F.3d 952, 955-56 (8th Cir. 1999) (citing *Assoc. Indep. Dealers, Inc. v. Mutual Service Ins. Co.*, 229 N.W.2d 516 (Minn. 1975)). Other courts have employed a "but for" test; in other words, the injury is only considered to have arisen out of the contractual breach if the injury would not have occurred *but for* the breach of contract. *Hugo Boss*, 252 F.3d at 623 n.15 (citing *Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 668 N.E. 2d 404 (N.Y. 1996)).

While the New Jersey Supreme Court has not endorsed either test, at least one New Jersey appellate decision applied a "but for" analysis under similar circumstances. The policy in *Tradesoft* also contained a breach of contract exclusion, and the injury there undoubtedly flowed from the contractual relationship between the parties.[13] Yet, in determining if the exclusion applied, the court considered whether any of the tort claims constituted an advertising injury. Moreover it did this without further reference to the contract exclusion. *Tradesoft*, 746 A.2d 1085-

---

[12] Following argument in this matter, Federal submitted two additional cases pursuant to Federal Rule of Appellate Procedure 28(j), *Information Spectrum, Inc. v. Hartford*, 834 A.2d 451 (N.J. Super. Ct. App. Div. 2003) and *Westport Reinsurance Mgmt., LLC v. St. Paul Fire & Marine Ins. Co.*, 80 Fed. Appx. 277 (2003). However, we do not need to discuss these cases because they simply follow the causation analysis set forth in *Tradesoft* and *Frog, Switch*.

---

[13] The insured–a company formed by two former employees of the underlying plaintiff–was only able to engage in the alleged torts because of information those employees obtained while under contract with the plaintiff.

1087.

Our situation is analogous. Although the relationship between Houbigant and the Insureds is contractual, the actions of the Insureds were independently tortious.[14] The contractual relationship was not endemic to the Insureds infringing of Houbigant's trademarks. Therefore, the contract exclusion does not apply to Houbigant's tort claims.

---

[14] Federal also argues that under New Jersey law we must look at the gravamen of Houbigant's complaint, which it contends lies in contract. In support of this proposition, Federal relies primarily on *Harleysville Ins. Cos. v. Garitta*, 785 A.2d 913 (N.J. 2001). In *Harleysville,* the New Jersey Supreme Court looked at the gravamen of a wrongful death action to determine the applicability of a policy exclusion barring coverage for bodily injury that was "expected or intended" by the insured. However, *Harleysville* is not inconsistent with *Tradesoft*; the two cases simply address different questions. In *Harleysville*, the court was forced to make a decision about the focus of a single claim (*i.e.*, whether the injury was expected or intended). On the other hand, in *Tradesoft*, there were two types of claims (tort and contract), which the court considered separately. Thus, the decision in *Harleysville* has no bearing on the matter at hand, which, like *Tradesoft*, deals with two independently actionable types of claims.

## 2. Umbrella Policy

Federal also issued an Umbrella policy, which contains two separate coverage provisions, Coverage A and Coverage B. We must also examine each of these provisions.

### a. Coverage A

Coverage A of the Umbrella policy is entitled "Excess Follow Form Liability Insurance" and covers "that part of the loss . . . in excess of the total applicable limits of [the] underlying insurance [policy] . . . ." R. at 278. This is known as a "follow form" policy. Under such a policy, "the parties agree that the coverage issues presented turn solely on the interpretation of the underlying polic[y]." *Piper Jeffray Co., Inc. v. Nat'l Union Fire Ins. Co.*, 967 F.Supp. 1148, 1151 (D. Minn. 1997). Here, the underlying policy is the CGL policy. Thus, based upon the foregoing discussion, we conclude that Houbigant's claim is covered by Coverage A of the Umbrella policy.

### b. Coverage B

Coverage B of the Umbrella policy is entitled "Umbrella Liability Insurance" and covers "damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under contract because of . . . advertising injury . . . ." R. at 279. Under Coverage B "advertising injury" includes "injury . . . arising solely out of . . . infringement of *copyrighted* titles, slogans or other advertising materials" and "committed in the course of

advertising." *Id.* at 288-89 (emphasis added). Basic rules of grammar suggest that "copyrighted" modifies "titles," "slogan," and "other advertising material." However, in *Platinum Tech., Inc. v. Fed. Ins. Co.*, 2000 WL 875881 (N.D. Ill., June 28, 2000) ("*Platinum I*"), the Northern District of Illinois considered the same policy language and found that "the term 'copyrighted' *did not* modify 'other advertising materials.'" *Id.* at *4 (emphasis added).[15] The court reasoned:

> A reading of the plain language of the umbrella policy does not support a requirement that 'advertising material' be copyrighted. Moreover, Federal's prior interpretation of the umbrella policy only further supports this court's finding. Federal specifically denied coverage because it found that the PSC's trademark

was not an 'advertising material' as defined by the umbrella policy and never mentioned that the 'advertising material' needed to be copyrighted. (Complaint, Ex. H, at 11). More importantly, the umbrella policy states the 'umbrella liability adds a broadening measure of coverage against many of the gaps in and between the underlying coverages' of the primary policy. (Complaint, Ex. F, at Introduction). The primary policy covers only infringement of copyrighted advertising materials as an advertising injury. (Complaint, Ex. E, at 19). Thus, based on the fact that the umbrella policy broadens the coverage, it is consistent with this court's finding that advertising materials need not be "copyrighted" in order to be covered under the umbrella policy.

*Id.*

Even though we disagree with much of the court's reasoning, we will look to New Jersey's collateral estoppel rules to determine if the *Platinum I* decision estops Federal from re-litigating the same issue here. *Semtek Intern. Inc.*

---

[15] The Northern District of Illinois issued a subsequent decision granting in part and denying in part cross motions for summary judgment. 2001 WL 109814 (N.D. Ill., Feb. 2, 2001). This decision was later reversed and remanded by the Seventh Circuit Court of Appeals on issues unrelated to the meaning and scope of the policy provision at issue here. 282 F.3d 927 (7th Cir. 2002).

*v. Lockheed Martin Corp.*, 531 U.S. 497, 508-09 (2001).  Under new Jersey law,

> [c]ollateral estoppel may apply if the party asserting the bar demonstrates that: (1) the issue to be precluded is identical to the issue decided in the first proceeding; (2) the issue was actually litigated in the prior action, that is, there was a full and fair opportunity to litigate the issue in the prior proceeding; (3) a final judgment on the merits was issued in the prior proceeding; (4) determination of the issue was essential to the prior judgment; and (5) the party against whom issue preclusion is asserted was a party to or in privity with a party to the prior proceeding.

*Pace v. Kuchinsky*, 789 A.2d 162, 171 (N.J. Super. Ct. App. Div. 2002).  There is no question that the latter four requirements are met in this case.  However, we are not as certain about the first requirement.  The *Platinum I* court relied on the fact that "Federal specifically denied coverage because it found that the [the insured's] trademark was not an 'advertising material' as defined by the umbrella policy and *never*

*mentioned that the 'advertising material' needed to be copyrighted . . . ."* *Platinum I*, 2000 WL 875881, at *4 (emphasis added).  The court's decision was therefore based, at least in part, on an argument that was specific to the facts of that case.  Here, however, Federal denied coverage based on the entire advertising injury provision in Coverage B, quoting the clause in its entirety in its denial letter.  R. at 716, 721.  Given the different circumstances, we conclude that Federal is not estopped from re-litigating the scope of the term "other advertising material."  Moreover, based on the plain meaning of the statute and the clarity of Federal's denial letter, we find that "copyrighted" does modify "other advertising material."  Thus, Coverage B is inapplicable since none of the trademarks at issue are copyrighted.  However, given our conclusion that the Insureds satisfy the requirements of the CGL policy and Coverage A, the absence of Coverage B is of little import.

## B.  Settlement Agreement

Having addressed all of the issues related to policy coverage, the only question remaining is whether the settlement of the bankruptcy claim was "reasonable in amount and entered into in good faith."  *Griggs v. Bertram*, 443 A.2d 163, 173 (N.J. 1982).  This, of course, is a question of fact, which we cannot resolve in the first instance.  However, Houbigant argues that Federal is bound by the bankruptcy court's finding that the settlement agreement was fair, reasonable, and entered into in good faith.  R. at 813.

We disagree.

In a diversity action, we apply the preclusion rules of the forum state, unless they are incompatible with federal interests. *Semtek*, 531 U.S. at 508-09. Under New Jersey law, a court must clearly state its rationale for finding that a settlement agreement is fair and reasonable. *See Jefferson Ins. Co. v. Health Care Ins. Exch.*, 588 A.2d 1275 247 (N.J. Super. Ct. App. Div. 1991) (remanding, in part, because the record did not indicate the reasoning behind the trial judge's finding that a settlement was fair and reasonable). As we noted in *Vargas v. Hudson County Bd. of Elections*, 949 F.2d 665, 674 (3d Cir. 1991), "[i]n deciding whether a settlement is prudent and reasonable, a court must consider the risk to the settling parties. It is the extent of the defendants' exposure to liability and not mere allegations in the plaintiffs' complaint that govern the appraisal of reasonableness."[16] Here, the bankruptcy court merely voiced the words "fair" and "reasonable," but failed to state any specific basis for such a finding. The court only noted that it had considered the "statements of all parties and any objections thereto," as well as the "pleadings and proofs of claim." R. at

813. This is insufficient to support a finding of reasonableness under state law, nor does it afford us a basis of review. The same would be true even assuming that the Insureds' motion in support of the settlement is incorporated by reference into the bankruptcy court's decision. The Insureds' motion, like the bankruptcy court's order, fails to address the merits of the tort claim; rather, it simply states that litigating the tort claims would be "complex and expensive." R. at 775. We therefore conclude that the bankruptcy court's settlement is not binding on Federal.

## IV.

Based on the foregoing analysis, we will reverse the judgment of the district court and remand the case for a plenary hearing to determine whether the bankruptcy settlement was reasonable and entered into in good faith.[17]

---

[16] There is no evidence that these rules are inconsistent with federal law. In fact, we have held that a bankruptcy court must consider, *inter alia*, "the probability of success in litigation. . . ." before approving a settlement. *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).

---

[17] Our ruling does not suggest that the district court would be unjustified in finding the settlement fair and reasonable on remand if it reaches that conclusion after a proper analysis and articulates that analysis on the record.